Filed July 27, 2022

On behalf of:
 Patent Owner Masimo Corporation
By: Jarom D. Kesler (Reg. No. 57,046)
 Joseph R. Re (Reg. No. 31,291)
 Stephen W. Larson (Reg. No. 69,133)
 Jacob L. Peterson (Reg. No. 65,096)
 KNOBBE, MARTENS, OLSON & BEAR, LLP
 2040 Main Street, 14th Floor
 Irvine, CA 92614
 Tel.: (949) 760-0404
 Email: AppleIPR2021-0193-708@knobbe.com

## UNITED STATES PATENT AND TRADEMARK OFFICE

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

IPR2021-00193
Patent 10,299,708

# PATENT OWNER'S NOTICE OF APPEAL TO THE U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT

IPR2021-00193 – Patent 10,299,708
Apple v. Masimo

Pursuant to 28 U.S.C. § 1295(a)(4)(A), 35 U.S.C. §§ 141(c), 142, and 319, 37 C.F.R. §§ 90.2(a) and 90.3, and Rule 4(a) of the Federal Rules of Appellate Procedure, Patent Owner Masimo Corporation ("Masimo") hereby appeals to the United States Court of Appeals for the Federal Circuit from the Judgment – Final Written Decision (Paper 30) entered on June 1, 2022 (Attachment A) and from all underlying orders, decisions, rulings, and opinions that are adverse to Masimo related thereto and included therein, including those within the Decision Granting Institution of *Inter Partes* Review, entered June 3, 2021 (Paper 7).   Masimo appeals the Patent Trial and Appeal Board's determination that claims 1-29 of U.S. Patent 10,299,708 are unpatentable, and all other findings and determinations, including but not limited to claim construction, as well as all other issues decided adverse to Masimo's position or as to which Masimo is dissatisfied in IPR2021-00193 involving Patent 10,299,708.

Masimo is concurrently providing true and correct copies of this Notice of Appeal, along with the required fees, to the Director of the United States Patent and Trademark Office and the Clerk of the United States Court of Appeals for the Federal Circuit.

IPR2021-00193 – Patent 10,299,708
Apple v. Masimo

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  July 27, 2022          By: /Jarom Kesler/
                               Jarom D. Kesler (Reg. No. 57,046)
                               Joseph R. Re (Reg. No. 31,291)
                               Stephen W. Larson (Reg. No. 69,133)
                               Jacob L. Peterson (Reg. No. 65,096)

                               Attorneys for Patent Owner
                               Masimo Corporation

# ATTACHMENT A

Trials@uspto.gov                                           Paper 30
571-272-7822                                         Date: June 1, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.,
Petitioner,

v.

MASIMO CORPORATION,
Patent Owner.

_____

IPR2021-00193
Patent 10,299,708 B1

_____

Before JOSIAH C. COCKS, ROBERT L. KINDER, and
AMANDA F. WIEKER, *Administrative Patent Judges*.

KINDER, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2021-00193
Patent 10,299,708 B1

# I.   INTRODUCTION

## A.   Background

Apple Inc. ("Petitioner") filed a Petition (Paper 2, "Pet.") pursuant to 35 U.S.C. §§ 311–319 to institute an *inter partes* review of claims 1–29 ("challenged claims") of U.S. Patent No. 10,299,708 B1 (Ex. 1001, "the '708 patent").  We instituted the petitioned review (Paper 7, "Institution Decision" or "Inst. Dec.").

Masimo Corporation ("Patent Owner") filed a Patent Owner Response (Paper 14, "PO Resp.") to oppose the Petition.  Petitioner filed a Reply (Paper 16, "Pet. Reply") to the Patent Owner Response.  Patent Owner filed a Sur-reply (Paper 19, "Sur-reply") to the Reply.  We conducted an oral hearing on March 15, 2022.  A transcript has been entered into the record (Paper 29, "Tr.").

We have jurisdiction under 35 U.S.C. § 6(b)(4) and § 318(a).  This Decision is a final written decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 as to the patentability of claims 1–29 of the '708 patent.  We determine Petitioner has shown by a preponderance of the evidence that those claims are unpatentable.

## B.   Related Matters

The parties identify the following matters related to the '708 patent:

*Masimo Corporation v. Apple Inc.*, Civil Action No. 8:20-cv-00048 (C.D. Cal.) (filed Jan. 9, 2020);

*Apple Inc. v. Masimo Corporation*, IPR2020-01520 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,258,265 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01521 (PTAB Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,292,628 B1);

IPR2021-00193
Patent 10,299,708 B1

*Apple Inc. v. Masimo Corporation*, IPR2020-01523 (PTAB Sept. 9, 2020) (challenging claims of U.S. Patent No. 8,457,703 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01524 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,433,776 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01526 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 6,771,994 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01536 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01537 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01538 (PTAB Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01539 (PTAB Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01713 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,624,564 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01714 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,631,765 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01715 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,631,765 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01716 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,702,194 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01722 (PTAB Oct. 2, 2020) (challenging claims of U.S. Patent No. 10,470,695 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01723 (PTAB Oct. 2, 2020) (challenging claims of U.S. Patent No. 10,470,695 B2);

IPR2021-00193
Patent 10,299,708 B1

*Apple Inc. v. Masimo Corporation*, IPR2020-01733 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,702,195 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01737 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,709,366 B1)

*Apple Inc. v. Masimo Corporation*, IPR2021-00195 (PTAB Nov. 20, 2020) (challenging claims of U.S. Patent No. 10,376,190 B1);

*Apple Inc. v. Masimo Corporation*, IPR2021-00208 (PTAB Nov. 20, 2020) (challenging claims of U.S. Patent No. 10,258,266 B1); and

*Apple Inc. v. Masimo Corporation*, IPR2021-00209 (PTAB Nov. 20, 2020) (challenging claims of U.S. Patent No. 10,376,191 B1).

Pet. 97–98; Paper 3, 3–4.

Patent Owner further identifies the following pending patent applications, among other issued and abandoned applications, that claim priority to, or share a priority claim with, the '708 patent:

U.S. Patent Application No. 16/834,538;

U.S. Patent Application No. 17/031,407;

U.S. Patent Application No. 17/031,316;

U.S. Patent Application No. 17/031,356;

U.S. Patent Application No. 16/449,143; and

U.S. Patent Application No. 16/805,605.

Paper 3, 2–3.

## C. The '708 Patent

The '708 patent is titled "Multi-Stream Data Collection System for Noninvasive Measurement of Blood Constituents," and issued on May 28, 2019, from U.S. Patent Application No. 16/261,366, filed Jan. 29, 2019. Ex. 1001, codes (21), (22), (45), (54). The '708 patent claims priority

IPR2021-00193
Patent 10,299,708 B1

through a series of continuation and continuation-in-part applications to Provisional Application Nos. 61/078,228 and 61/078,207, both filed July 3, 2008. *Id.* at codes (60), (63).

The '708 patent discloses a two-part data collection system including a noninvasive sensor that communicates with a patient monitor. *Id.* at 2:31–33. The sensor includes a sensor housing, an optical source, and several photodetectors, and is used to measure a blood constituent or analyte, e.g., oxygen or glucose. *Id.* at 2:22–28, 2:57–58. The patient monitor includes a display and a network interface for communicating with a handheld computing device. *Id.* at 2:38–40.

Figure 1 of the '708 patent is reproduced below.



Figure 1 illustrates a block diagram of data collection system 100 including sensor 101 and monitor 109. *Id.* at 11:36–47. Sensor 101 includes optical emitter 104 and detectors 106. *Id.* at 11:48–52. Emitters 104 emit light that

is attenuated or reflected by the patient's tissue at measurement site 102. *Id.* at 13:60–67. Detectors 106 capture and measure the light attenuated or reflected from the tissue. *Id.* In response to the measured light, detectors 106 output detector signals 107 to monitor 109 through front-end interface 108. *Id.* at 13:64–66, 14:16–22. Sensor 101 also may include tissue shaper 105, which may be in the form of a convex surface that: (1) reduces the thickness of the patient's measurement site; and (2) provides more surface area from which light can be detected. *Id.* at 10:61–11:3.

Monitor 109 includes signal processor 110 and user interface 112. *Id.* at 15:6–8. "[S]ignal processor 110 includes processing logic that determines measurements for desired analytes . . . based on the signals received from the detectors." *Id.* at 15:10–14. User interface 112 presents the measurements to a user on a display, e.g., a touch-screen display. *Id.* at 15:38–48. The monitor may be connected to storage device 114 and network interface 116. *Id.* at 15:52–16:3.

The '708 patent describes various examples of sensor devices. Figures 14D and 14F, reproduced below, illustrate sensor devices.



FIG. 14D                    FIG. 14F

IPR2021-00193
Patent 10,299,708 B1

Figure 14D illustrates portions of a detector submount and Figure 14F
illustrates portions of a detector shell. *Id.* at 6:34–37. As shown in
Figure 14D, multiple detectors 1410c are located within housing 1430 and
under transparent cover 1432, on which protrusion 605b (or partially
cylindrical protrusion 605) is disposed. *Id.* at 35:23–25, 36:17–24.
Figure 14F illustrates a detector shell 306f including detectors 1410c on
substrate 1400c. *Id.* at 36:63–37:4. Substrate 1400c is enclosed by shielding
enclosure 1490 and noise shield 1403, which include window 1492a and
window 1492b, respectively, placed above detectors 1410c. *Id.*
Alternatively, cylindrical housing 1430 may be disposed under noise
shield 1403 and may enclose detectors 1410c. *Id.* at 37:34–36.

Figures 4A and 4B, reproduced below, illustrate an alternative
example of a tissue contact area of a sensor device.



Figures 4A and 4B illustrate arrangements of protrusion 405 including
measurement contact area 470. *Id.* at 23:8–14. "[M]easurement site contact
area 470 can include a surface that molds body tissue of a measurement
site." *Id.* "For example, . . . measurement site contact area 470 can be
generally curved and/or convex with respect to the measurement site." *Id.* at
23:31–33. The measurement site contact area may include windows 420–

IPR2021-00193
Patent 10,299,708 B1

423 that "mimic or approximately mimic a configuration of, or even house, a plurality of detectors." *Id.* at 23:39–53.

### *D.  Illustrative Claim*

Of the challenged claims, claims 1 and 19 are independent.  Claim 1 is illustrative and is reproduced below.

> 1.  A noninvasive optical physiological sensing system comprising:
>
> [a] a platform including a planar surface;
>
> [b] a housing including a raised edge portion extending from and enclosing at least a portion of the planar surface;
>
> [c] at least four detectors arranged on the planar surface of the platform and within the housing, wherein the at least four detectors are arranged in a grid pattern such that a first detector and a second detector are arranged across from each other on opposite sides of a central point along a first axis, and a third detector and a fourth detector are arranged across from each other on opposite sides of the central point along a second axis which is perpendicular to the first axis; and
>
> [d] the housing including a protruding light permeable cover.

Ex. 1001, 44:36–50 (bracketed identifiers [a]–[d] added).  Independent claim 19 includes limitations similar to limitations [a]–[d] of claim 1 but also requires distinct limitations discussed more below.  *Id.* at 45:53–46:11 (reciting a "platform," "at least four detectors," and a "light permeable cover . . . protruding above the raised wall").

IPR2021-00193
Patent 10,299,708 B1

### E.    *Evidence Relied Upon*

Petitioner relies on the following references:

| Reference | Publication/Patent Number | Exhibit |
|---|---|---|
| Aizawa | U.S. Patent Application Publication No. 2002/0188210 A1, filed May 23, 2002, published December 12, 2002. | 1006 |
| Inokawa | Japanese Patent Application Publication No. 2006-296564 A, filed April 18, 2005, published November 2, 2006. | 1007, 1008[1] |
| Ohsaki | U.S. Patent Application Publication No. 2001/0056243 A1, filed May 11, 2001, published December 27, 2001. | 1014 |
| Mendelson-2006 | "A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring," Proceedings of the 28th IEEE EMBS Annual International Conference, 912–915 (2006). | 1016 |
| Beyer | U.S. Patent No. 7,031,728 B2 issued April 18, 2006. | 1019 |
| Goldsmith | U.S. Patent Application Publication No. 2007/0093786 A1, filed July 31, 2006, published April 26, 2007. | 1027 |
| Lo | U.S. Patent Application Publication No. 2004/0138568 A1, filed June 15, 2003, published July 15, 2004. | 1028 |
| Mendelson-1988 | "Design and Evaluation of a New Reflectance Pulse Oximeter Sensor," Worcester Polytechnic Institution, Biomedical Engineering Program, Worcester, MA 01609; Association for the Advancement of Medical Instrumentation, Vol. 22, No. 4, 1988, 167–173. | 1015 |

Pet. 1–2.

Petitioner also relies on the declaration testimony of Thomas W. Kenny, Ph.D. (Exhibits 1003 and 1047).  Patent Owner relies on the

---

[1] Exhibit 1008 is an English translation of Exhibit 1007.

IPR2021-00193
Patent 10,299,708 B1

declaration testimony of Vijay K. Madisetti, Ph.D. (Exhibit 2004). The parties also provide deposition testimony from Dr. Kenny and Dr. Madisetti, including from this and other proceedings. *See* Exs. 1034–1036, 2006–2009, 2027.

### F.    Asserted Grounds

We instituted an *inter partes* review based on the following grounds:

| Claim(s) Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 1–9, 11, 13–15, 19–22, 24–27 | 103 | Aizawa, Inokawa |
| 1–9, 11, 13–15, 19–22, 24–27 | 103 | Aizawa, Inokawa, Ohsaki |
| 16, 27, 28 | 103 | Aizawa, Inokawa, Mendelson-2006 |
| 17, 18, 29 | 103 | Aizawa, Inokawa, Mendelson-2006, Beyer |
| 16–18, 27–29 | 103 | Aizawa, Inokawa, Goldsmith, Lo |
| 10 | 103 | Aizawa, Inokawa, Al-Ali |
| 1–9, 11–15, 19–26 | 103 | Mendelson-1988, Inokawa |
| 16, 27, 28 | 103 | Mendelson-1988, Inokawa, Mendelson-2006 |
| 17, 18, 29 | 103 | Mendelson-1988, Inokawa, Mendelson-2006, Beyer |

### II.    ANALYSIS

### A.    Principles of Law

A claim is unpatentable under 35 U.S.C. § 103 if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406

IPR2021-00193
Patent 10,299,708 B1

(2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of non-obviousness.[2] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). When evaluating a combination of teachings, we must also "determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). Whether a combination of prior art elements would have produced a predictable result weighs in the ultimate determination of obviousness. *Id.* at 416–417.

In an *inter partes* review, the petitioner must show with particularity why each challenged claim is unpatentable. *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016); 37 C.F.R. § 42.104(b). The burden of persuasion never shifts to Patent Owner. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

We analyze the challenges presented in the Petition in accordance with the above-stated principles.

## B.    Level of Ordinary Skill in the Art

Petitioner identifies the appropriate level of skill in the art as that possessed by a person having "a Bachelor of Science degree in an academic discipline emphasizing the design of electrical, computer, or software technologies, in combination with training or at least one to two years of related work experience with capture and processing of data or information,

---

[2] The parties do not present objective evidence of non-obviousness based on the final record.

IPR2021-00193
Patent 10,299,708 B1

including but not limited to physiological monitoring technologies." Pet. 4–5 (citing Ex. 1003 ¶¶ 21–22). "Alternatively, the person could have also had a Master of Science degree in a relevant academic discipline with less than a year of related work experience in the same discipline." *Id.*

Patent Owner does not challenge using Petitioner's asserted level of skill, but notes that "asserted level of skill (1) requires no coursework, training or experience with optics or optical physiological monitors; (2) requires no coursework, training or experience in physiology; and (3) focuses on data processing and not sensor design." PO Resp. 9–10 (citing Pet. 4–5; Ex. 2004 ¶¶ 35–38).

We adopt Petitioner's assessment for the person of ordinary skill in the art ("POSITA") as set forth above, which appears consistent with the level of skill reflected in the Specification and prior art.

## C.    *Claim Construction*

For petitions filed on or after November 13, 2018, a claim shall be construed using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b). 37 C.F.R. § 42.100(b) (2019). Although both parties contend that no claim term requires express construction (Pet. 4; PO Resp. 9), the substance of the parties' briefing demonstrates that there is a dispute regarding the claim term "cover."

### 1.    *"cover"*

Each of independent claims 1 and 19 requires "a light permeable cover." Ex. 1001, 44:50, 46:10.

IPR2021-00193
Patent 10,299,708 B1

Patent Owner argues that the claimed "cover" excludes "an optically clear adhesive/epoxy" and a "resin on a surface." PO Resp. 45–47. According to Patent Owner, "the '708 Patent distinguishes a resin on a surface from a cover, explaining: 'the cylindrical housing 1430 (and transparent cover 1432) . . . can protect the detectors 1410c and conductors 1412c *more effectively* than currently-available *resin epoxies*.'" *Id.* at 45 (quoting Ex. 1001, 36:37–46).

Patent Owner alleges that Dr. Kenny also "distinguished a sealing resin from a cover, acknowledging a 'layer of sealing resin' is 'one way to protect the components *without using a cover*.'" *Id.* at 45–46 (quoting Ex. 2009, 395:22–396:17). Patent Owner argues its understanding is consistent with the prior art cited by Petitioner. *Id.* at 46 (citing Ex. 1008 ¶ 103, Fig. 17; Ex. 1023 ¶ 35; Ex. 1012, 5:2–6, Fig. 2B; Ex. 1013 ¶ 32, Fig. 2; Ex. 1027 ¶ 85, Fig. 9B; Ex. 2004 ¶ 104).

Petitioner replies that "there is nothing in the specification or the prosecution history [of the '708 patent] that would lead a [person of ordinary skill in the art] to conclude that 'cover' should be interpreted based on anything other than its plain meaning." Pet. Reply 21 (citing *Thorner v. Sony Computer Entertainment America LLC*, 669 F.3d 1362, 1368 (Fed. Cir. 2012)). That plain meaning, according to Petitioner, is that "a cover is merely 'something that protects, shelters, or guards.'" *Id.* at 21 (quoting Ex. 1050; citing Pet. 74–75; Ex. 1047 ¶ 43). Petitioner argues that Patent Owner's reliance on the '708 patent Specification takes text out of context and, when context is considered, it is clear that "the epoxy resin to which the '708 patent compares its cover is not [an] epoxy cover . . . but rather epoxy that is applied to solder joints." *Id.* at 21–22 (citing Ex. 1001, 36:37–46; Ex. 1047 ¶ 45).

IPR2021-00193
Patent 10,299,708 B1

Petitioner also contends that Patent Owner "mischaracterizes Dr. Kenny's deposition testimony to say he agreed that 'sealing resin' is somehow distinguished from a cover." *Id.* at 21. Petitioner contends that Dr. Kenny simply "clarified that using a sealing resin is 'a pretty common way to protect electronic components.'" *Id.* (citing Ex. 2009, 395:22–396:17; Ex. 1047 ¶ 44). Moreover, Petitioner contends that "such extrinsic evidence would not justify departure from plain meaning under *Thorner*." *Id.*

In its Sur-reply, Patent Owner maintains that the '708 patent "specifically ***distinguishes*** a 'resin' on a surface from a 'cover,'" and Petitioner's opposing reading is not persuasive. Sur-reply 19–21.

Upon review of the record, we disagree with Patent Owner's limiting construction of "cover" to exclude epoxy and resin. The plain and ordinary meaning of the term does not support Patent Owner's view. A "cover" ordinarily connotes "something that protects, shelters, or guards." Ex. 1050,[3] 288. That plain and ordinary meaning is consistent with the '708 patent's description of "flex circuit cover 360, which can be made of plastic or another suitable material . . . [and] can cover and thereby protect a flex circuit (not shown)." Ex. 1001, 22:63–65. It also is consistent with the '708 patent's description and illustration of "transparent cover 1432" in Figure 14D, which covers and protects detectors 1410c and conductors 1412c, and which "can be fabricated from glass or plastic, *among other materials*." *See id.* at 36:23–32 (emphasis added), Figs. 14D–14E.

This is not the situation in which a special definition for a claim term has been set forth in the specification with reasonable clarity, deliberateness,

---

[3] *Merriam-Webster's Collegiate Dictionary*, 11th ed. (©2005).

IPR2021-00193
Patent 10,299,708 B1

and precision, so as to give notice of the inventor's own lexicography. *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1370 (Fed. Cir. 2005); *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). Nor do we discern that Patent Owner "demonstrate[d] an intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).

Here, based upon our review of the intrinsic evidence, no such special definition or express disavowal of the term "cover" to exclude epoxy and resin exists. Patent Owner relies on the following description of Figure 14D in that regard:

> *In certain embodiments, the cylindrical housing 1430 (and transparent cover 1432)* forms an airtight or substantially airtight or hermetic seal with the submount 1400c. As a result, the cylindrical housing 1430 can protect the detectors 1410c and conductors 1412c from fluids and vapors that can cause corrosion. Advantageously, *in certain embodiments, the cylindrical housing 1430 can protect* the detectors 1410c and conductors 1412c *more effectively than currently-available resin epoxies*, which are sometimes applied to solder joints between conductors and detectors.

Ex. 1001, 36:37–46 (emphases added). First, the sentence cited by Patent Owner begins with the phrase "[i]n certain embodiments," which indicates the claimed invention is not limited and is open to other embodiments, so there is no lexicography or disavowal here. Second, we agree with Petitioner's reading of this passage as distinguishing the prior art from the claimed invention based on the *location* of the material (applied only to solder joints between conductors and detectors in the prior art, as opposed to covering the conductors and detectors in the invention) and not the *type* of

IPR2021-00193
Patent 10,299,708 B1

material. Third, at best, the '708 patent expresses a preference for a cover to be made of glass or plastic, because such materials provide "more effective[]" protection than resin epoxies that were known when the '708 patent was filed. *See id.* at 36:39–45. But even this reading recognizes that resin epoxies provide some amount of protection, albeit perhaps a lesser amount than glass or plastic, and are not excluded from forming the material of a cover.

Dr. Kenny's deposition testimony cited by Patent Owner also does not persuade us that, in the context of the '708 patent, epoxy or resin is excluded from the material of a cover. Dr. Kenny testifies that "a layer of sealing resin" "[c]ould" be used to protect the electronic components in a sensor (Ex. 2009, 395:22–396:8). He was then asked "So that would be one way to protect the components without using a cover, correct?" to which he answered "[t]here are many ways to protect the elements other than using a cover" and maintained that the proposed combination of prior art has a "cover" to achieve purposes *other than* protecting electronic components, i.e., "to improve adhesion and to improve light gathering for the operation of the system." *Id.* at 396:9–17. He did not squarely testify that sealing resin may never be a cover.

Accordingly, in the context of the '708 patent, we do not construe the claimed "cover" to exclude epoxy and resin.

## 2. Other Claim Terms

Upon consideration of the entirety of the arguments and evidence presented, we conclude no further explicit construction of any claim term is needed to resolve the issues presented by the arguments and evidence of record. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*

*Matal*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (per curiam) (claim terms need to be construed "only to the extent necessary to resolve the controversy" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

### D.    *Obviousness over Aizawa and Inokawa*

Petitioner contends that claims 1–9, 11, 13–15, 19–22, and 24–27 of the '708 patent would have been obvious over the combined teachings of Aizawa and Inokawa.  Pet. 7–40.

### 1.    *Overview of Aizawa (Ex. 1006)*

Aizawa is a U.S. patent application publication titled "Pulse Wave Sensor and Pulse Rate Detector," and discloses a pulse wave sensor worn on a user's wrist that detects light output from a light emitting diode and reflected from a patient's artery.  Ex. 1006, codes (54), (57).

Figure 1(a) of Aizawa is reproduced below.



Figure 1(a) is a plan view of a pulse wave sensor.  *Id.* ¶ 23.  As shown in Figure 1(a), pulse wave sensor 2 includes light emitting diode ("LED") 21, four photodetectors 22 symmetrically disposed around LED 21, and holder 23 for storing LED 21 and photodetectors 22.  *Id.*  Aizawa discloses

IPR2021-00193
Patent 10,299,708 B1

that, "to further improve detection efficiency, . . . the number of the photodetectors 22 may be increased." *Id.* ¶ 32, Fig. 4(a). "The same effect can be obtained when the number of photodetectors 22 is 1 and a plurality of light emitting diodes 21 are disposed around the photodetector 22." *Id.* ¶ 33.

Figure 1(b) of Aizawa is reproduced below.



Figure 1(b) is a sectional view of the pulse wave sensor. *Id.* ¶ 23. As shown in Figure 1(b), pulse wave sensor 2 includes drive detection circuit 24 for detecting a pulse wave by amplifying the outputs of photodetectors 22. *Id.* Arithmetic circuit 3 computes a pulse rate from the detected pulse wave and transmitter 4 transmits the pulse rate data to an "unshown display." *Id.* The pulse rate detector further includes outer casing 5 for storing pulse wave sensor 2, acrylic transparent plate 6 mounted to detection face 23a of holder 23, and attachment belt 7. *Id.*

Aizawa discloses that LED 21 and photodetectors 22 "are stored in cavities 23b and 23c formed in the detection face 23a" of the pulse wave sensor. *Id.* ¶ 24. Detection face 23a "is a contact side between the holder 23 and a wrist 10, respectively, at positions where the light emitting face 21s of the light emitting diode 21 and the light receiving faces 22s of the photodetectors 22 are set back from the above detection face 23a." *Id.*

IPR2021-00193
Patent 10,299,708 B1

Aizawa discloses that "a subject carries the above pulse rate detector 1 on the inner side of his/her wrist 10 . . . in such a manner that the light emitting face 21s of the light emitting diode 21 faces down (on the wrist 10 side)." *Id.* ¶ 26. Acrylic transparent plate 6 is disposed between holder 23 and the user's wrist 10. *Id.* ¶¶ 23, 26, 30. Furthermore, "belt 7 is fastened such that the acrylic transparent plate 6 becomes close to the artery 11 of the wrist 10." *Id.* ¶ 26. "Since the acrylic transparent plate 6 is provided on the detection face 23a of the holder 23, adhesion between the pulse rate detector 1 and the wrist 10 can be improved, thereby further improving the detection efficiency of a pulse wave." *Id.* ¶ 30.

### 2. *Overview of Inokawa (Ex. 1008)*

Inokawa is a Japanese published patent application titled "Optical Vital Sensor, Base Device, Vital Sign Information Gathering System, and Sensor Communication Method," and discloses a pulse sensor device that may be worn on a user's wrist. Ex. 1008, code (54), ¶ 56.[4]

---

[4] Exhibit 1008 is an English translation of Exhibit 1007. In this Decision, all citations are to the English translation.

IPR2021-00193
Patent 10,299,708 B1

Figure 1 of Inokawa is reproduced below.



(FIG. 1)

Figure 1 illustrates a perspective view of a pulse sensor. *Id.* ¶ 56. Pulse
sensor 1 includes box-shaped sensor unit 3 and flexible annular wristband 5.
*Id.* ¶ 57. Sensor unit 3 includes a top surface with display 7 and control
switch 9, and a rear surface (sensor-side) with optical device component 11
for optically sensing a user's pulse. *Id.*

Figure 2 of Inokawa is reproduced below.



(FIG. 2)

Figure 2 illustrates a schematic view of the rear surface of the pulse sensor.
*Id.* ¶ 58. The rear-side (sensor-side) of pulse sensor 1 includes a pair of

IPR2021-00193
Patent 10,299,708 B1

light-emitting elements, i.e., green LED[5] 21 and infrared LED 23, as well as photodiode 25 and lens 27. *Id.* In various embodiments, Inokawa discloses that the sensor-side lens is convex. *See id.* ¶¶ 99, 107. Green LED 21 senses "the pulse from the light reflected off of the body (i.e.[,] change in the amount of hemoglobin in the capillary artery)," and infrared LED 23 senses body motion from the change in reflected light. *Id.* ¶ 59. The pulse sensor stores this information in memory. *Id.* ¶ 68. To read and store information, the pulse sensor includes a CPU that "performs the processing to sense pulse, body motion, etc. from the signal . . . and temporarily stores the analysis data in the memory." *Id.* ¶ 69.

Pulse sensor 1 includes lens 27, which "makes it possible to increase the light-gathering ability of the LED as well as to protect the LED or PD[6]." *Id.* ¶¶ 15, 58. Pulse sensor 1 also uses LEDs 21 and 23 to download data to a base station, as shown in Figure 3, reproduced below.

---

[5] We understand "LED" to be an acronym for "light emitting diode."
[6] We understand "PD" to be an acronym for "photodiode."

IPR2021-00193
Patent 10,299,708 B1



Figure 3 illustrates a schematic view of a pulse sensor mounted to a base device. *Id.* ¶ 60. Pulse sensor 1 is depicted as mounted to base device 17, which "is a charger with communication functionality." *Id.* When so mounted, sensor optical device component 11 and base optical device component 41 face each other in close proximity. *Id.* ¶ 66. In this position, pulse sensor 1 can output information to the base device through the coupled optical device components. *Id.* ¶ 67. Specifically, the pulse sensor CPU performs the controls necessary to transmit pulse information using infrared LED 23 to photodetector 45 of base device 17. *Id.* ¶¶ 67, 70, 76. In an alternative embodiment, additional sensor LEDs and base photodetectors can be used to efficiently transmit data and improve accuracy. *Id.* ¶ 111.

IPR2021-00193
Patent 10,299,708 B1

### 3. Independent Claim 1

Petitioner contends that claim 1 would have been obvious over the combined teachings of Aizawa and Inokawa. Pet. 12–16 (combination), 16–24 (claim 1).

### i. "A noninvasive optical physiological sensing system comprising:"

Based on the final record, the cited evidence supports Petitioner's undisputed contention that Aizawa discloses a measurement device, i.e., a pulse sensor worn on a wearer's wrist. Pet. 16; *see, e.g.*, Ex. 1006 ¶ 2 ("[A] pulse wave sensor for detecting the pulse wave of a subject from light reflected from a red corpuscle in the artery of a wrist of the subject by irradiating the artery of the wrist with light.").

### ii. [a] "a platform including a planar surface;"

The cited evidence supports Petitioner's undisputed contention that Aizawa discloses holder 23 for storing light emitting diode 21 and photodetectors 22 and a platform including a planar surface on which holder 23 is placed. Pet. 17–18; *see, e.g.*, Ex. 1006 ¶ 23 ("LED 21 . . . for emitting light having a wavelength of a near infrared range"), Figs. 1(a)–(b). Petitioner provides the following annotated Figure 1(b) depicting the planar surface in brown.

IPR2021-00193
Patent 10,299,708 B1



Pet. 18.  Annotated Figure 1(b) depicts Aizawa's sensor with the platform with a planar surface depicted in brown.  *Id.*  Petitioner contends that a person of ordinary skill in the art "would have understood that the various electronic components of Aizawa, including its detectors and emitter, are positioned within the holder 23 and further connected, through the identified platform that supports the holder 23, to a drive circuit 24 on the other side of the holder/platform."  *Id.* (citing Ex. 1006 ¶ 23; Ex. 1003 ¶ 75).

> iii.    [b] *"a housing including a raised edge portion extending from and enclosing at least a portion of the planar surface"*

The cited evidence supports Petitioner's undisputed contention that Aizawa discloses holder 23, which includes a flat surface and a circular raised edge extending from the surface.  Pet. 19; *see, e.g.*, Ex. 1006 ¶ 23 ("holder 23 for storing . . . light emitting diode 21 and the photodetectors 22"), Figs. 1(a)–(b) (depicting holder 23 surrounding each detector 22); Ex. 1003 ¶¶ 76–77.  Petitioner provides annotated versions of Aizawa's Figures 1(a) and 1(b), which are reproduced below.

IPR2021-00193
Patent 10,299,708 B1



Pet. 19–20.  Figures 1(a) and 1(b) depict side and top views of Aizawa's sensor with the housing depicted in red (holder 23), the raised edge depicted in purple, and the planar surface depicted in brown.  *Id.*

> iv.    [c] *"at least four detectors arranged on the planar surface of the platform and within the housing, wherein the at least four detectors are arranged in a grid pattern such that a first detector and a second detector are arranged across from each other on opposite sides of a central point along a first axis, and a third detector and a fourth detector are arranged across from each other on opposite sides of the*

IPR2021-00193
Patent 10,299,708 B1

> *central point along a second axis which is*
> *perpendicular to the first axis; and"*

The cited evidence supports Petitioner's undisputed contention that Aizawa discloses at least four detectors 22 that are disposed around light emitting diode 21 symmetrically in a perpendicular grid pattern around light emitting diode 21. Pet. 20–21; *see, e.g.*, Ex. 1006 ¶ 23 ("drive detection circuit 24 for detecting a pulse wave by amplifying the outputs of the photodetectors 22"), Fig. 1(a) (depicting detectors 22 spaced apart around LED 21 in a symmetric grid pattern), Fig. 1(b) (depicting detectors 22 connected to a drive circuit 24 on the other side of the housing), ¶ 28 ("the amplified output is converted into a digital signal for the computation of a pulse rate"); Ex. 1003 ¶¶ 78–80.

Petitioner provides annotated Figure 1(a) of Aizawa showing how the four detectors "are arranged relative to a central point and first/second axes in the manner claimed, with the first/second axes being perpendicular to each other." Pet. 22.



Pet. 22. Annotated Figure 1(a) depicts four detectors (in red) arranged in a grid pattern such that the first and second detector form a first axis that is

IPR2021-00193
Patent 10,299,708 B1

perpendicular to a second axis formed by the third and fourth detectors. *Id.*
We find Petitioner's showing persuasive based on the final record.

> v.    [d] *"the housing including a protruding light*
>       *permeable cover."*

>> *(1)    Petitioner's Contentions*

Petitioner contends that the cited evidence discloses this limitation.
Pet. 12–16, 22–24. Specifically, Petitioner contends that Aizawa discloses a
protruding cover in the form of an "acrylic transparent plate" mounted over
at least a portion of the housing and to cover the at least four detectors. *Id.*
at 22; Ex. 1006 ¶¶ 23, 34 ("[A]crylic transparent plate 6 is provided on the
detection face 23a of the holder 23 to improve adhesion to the wrist 10."),
Fig. 1(b) (depicting flat, transparent plate 6 between sensor 2 and wrist 10);
Ex. 1003 ¶ 83 ("Because the light permeable cover of Aizawa . . . protrudes
from the rest of the housing and is designed to be pressed into the skin when
worn, it is protruding—and is thus a protruding light permeable cover.").

Petitioner further contends that Inokawa also teaches a protruding
light permeable cover and provides motivation for incorporating such a
cover into Aizawa. Pet. 13, 23. Specifically, Inokawa's lens 27 is
positioned between its sensor and the wearer's skin, which increases the
light gathering ability of the sensor. *Id.* at 13, 23; *see, e.g.*, Ex. 1008 ¶¶ 15
("This lens makes it possible to increase the light-gathering ability of the
LED as well as to protect the LED or PD."), 58 (disclosing "a single
photodiode (S-side PD) 25 that receives the reflected light from these
[LEDs], and an S-side lens 27"), Fig. 2.

In light of these teachings, Petitioner contends that a person of
ordinary skill in the art "would have found it obvious to modify the flat

27

IPR2021-00193
Patent 10,299,708 B1

acrylic plate of Aizawa, as illustrated below, to further Aizawa's objective of enhancing light-collection efficiency," i.e., "by modifying the light permeable cover of Aizawa to include a convex protrusion that acts as a lens." Pet. 13, 23–24.



Light permeable cover

Pet. 14–15, 23–24; Ex. 1006 ¶¶ 13 (explaining that transparent plate 6 seeks to "improve adhesion" and "improve the detection efficiency of pulse waves"), 30 (same); Ex. 1008 ¶ 15; Ex. 1003 ¶¶ 82–87. Petitioner's annotated and modified Figures depict Aizawa's sensor including its flat transparent plate (left) and a modified version of Aizawa's sensor in which the plate includes a convex protrusion. Pet. 14, 24.

Petitioner contends this modification would have enjoyed a reasonable expectation of success because, for example, Inokawa teaches that the cover may be flat, like that of Aizawa, to reduce scratches, or in the form of a lens, as in Petitioner's proposed modification, to increase light gathering ability. *Id.* at 14–16; *see, e.g.*, Ex. 1008 ¶¶ 15 ("This lens makes it possible to increase the light-gathering ability."), 106 ("[B]ecause the surface of the covers 123, 131 is flat, the surface is less prone to scratches than when the lens protrudes."); Ex. 1003 ¶ 88.

IPR2021-00193
Patent 10,299,708 B1

### (2)    Patent Owner's Response

Patent Owner counters, arguing Aizawa alone "does not '[disclose] a protruding light permeable cover,' as required by claim 1." PO Resp. 15. According to Patent Owner, Petitioner has presented conflicting interpretations and assertions as to whether Aizawa's transparent plate (6) protrudes from holder (23). *Id.* (citing Pet. 9; Ex. 2004 ¶ 49). Patent Owner explains that "Petitioner's argument depends on arbitrarily changing Petitioner's identification of the 'housing' from (1) merely the holder (23) . . . to (2) the holder (23) and the transparent plate (6)." *Id.* at 14. However, Patent Owner argues that even if transparent plate (6) is part of the "housing," "there is no protrusion, as required by claim 1—the transparent plate (6) merely forms a flat face on the 'housing.'" *Id.* at 15.

Patent Owner does not dispute that Inokawa discloses such a protruding light permeable cover, but does argue that Petitioner has not shown that a person of ordinary skill in the art would have been motivated to combine Inokawa's convex lens with Aizawa's sensor. PO Resp. 15–35. According to Patent Owner, "neither Petitioner nor Dr. Kenny explains why a POSITA would have believed that Inokawa's convex lens, which concentrates light to a central detector, would enhance light collection in Aizawa's sensor (and the illustrated combination) with peripheral detectors." *Id.* at 14 (emphasis omitted). Rather, Patent Owner argues that "Petitioner, Dr. Kenny, and the '708 Patent all agree that a POSITA would have understood that Inokawa's protruding surface would direct incoming light towards the center of the sensor," which "undermines Petitioner's proposed combination because Aizawa's detectors are located at the periphery of the sensor." *Id.* at 19. Patent Owner explains that "a POSITA would have believed that Inokawa's protruding surface would direct light *away* from the

IPR2021-00193
Patent 10,299,708 B1

*periphery*-located detectors." *Id.* at 20 (citing Ex. 2004 ¶¶ 42–43, 50–59). As such, "a POSITA would have believed that a protruding surface would have undesirably *decreased* light-collection efficiency at Aizawa's peripheral detectors, reducing the measured optical signal." *Id.* (citing Ex. 1006 ¶¶ 26, 30; Ex. 2004 ¶ 60). Patent Owner further argues that the '708 patent illustrates how a protruding convex surface focuses light away from the periphery and towards the center. *Id.* at 23–24 (citing Ex. 1001, Fig. 14B).

Patent Owner contends that Dr. Kenny's testimony to the contrary is either contradictory or unsupported. Patent Owner writes that "Dr. Kenny admitted 'one of ordinary skill in the art would expect a diffuse light source encountering a convex lens of the sort that we're contemplating today, would lead to convergence of the light on the opposite side of the lens, in general' and that there would be 'a convergence of most of the light rays.'" *Id.* at 24 (citing Ex. 2007, 423:7–424:18) (emphases omitted). Comparing Dr. Kenny's testimony in the present case to prior testimony in IPR2020-01520, Patent Owner argues that Dr. Kenny's testimony is inconsistent or contradictory. *See id.* at 15–19, 22–26 (comparing prior testimony discussing how such a protruding surface like Inokawa's lens would cause incoming light to condense toward the center). Patent Owner's contention is that Dr. Kenny's "testimony falls far short of establishing a valid motivation to combine Inokawa with Aizawa, much less a reasonable expectation of success," with the "discussion of a reasonable expectation of success focus[ing] almost entirely on manufacturing." *Id.* at 31 (citing Ex. 2004 ¶ 75; Ex. 1003 ¶ 89). This possibility that a person of ordinary skill in the art could manufacture such a sensor, according to Patent Owner, falls short

IPR2021-00193
Patent 10,299,708 B1

of showing that such a person would reasonably expect success. *Id.* (citing Ex. 2004 ¶ 75; *In re Stepan Co.*, 868 F.3d 1342, 1347 (Fed. Cir. 2017)).

Patent Owner moreover asserts Petitioner errs in relying on Nishikawa as supporting the unpatentability of claim 1, because Nishikawa is "not identified as part of" the ground, which instead "includes only two references," Aizawa and Inokawa. PO Resp. 32 (citing Pet. 1–2, 15–16; Ex. 1003 ¶¶ 89); *id.* at 33–35 (citing 35 U.S.C. § 312(a)(3); *Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir. 2016)). Patent Owner asserts Dr. Kenny "relies heavily" on Nishikawa, particularly "to inform the specific shape of the cover in his similar combination, which is found nowhere in Aizawa and Inokawa." *Id.* at 32, 34–35 (citing Pet. 23; Ex. 2004 ¶¶ 76–77; Ex. 2006, 179:21–180:13; Ex. 2007, 364:2–13; Ex. 2008, 73:8–12).

Furthermore, in Patent Owner's view, "Petitioner's extensive reliance on Nishikawa makes no sense" because "Nishikawa's device is not a physiological sensor" but rather is "an encapsulated LED" that "directs *outgoing* light through the encapsulation material and thus focuses on the emission of light, not the detection of an optical signal." PO Resp. 34 (citing Ex. 1023, code (57), ¶¶ 3, 32, 35; Ex. 2004 ¶ 78). Patent Owner contrasts such disclosure with Aizawa and Inokawa, both of which "detect[] *incoming* light that passes through the cover and reaches the detectors," and which have a "drastically" smaller scale than Nishikawa's LEDs. *Id.* (citing Ex. 1008, Fig. 2; Ex. 2004 ¶ 78).

### (3) *Petitioner's Reply*

In reply, Petitioner reiterates that "a POSITA would have been motivated to incorporate 'an Inokawa-like lens into the cover of Aizawa to

IPR2021-00193
Patent 10,299,708 B1

increase the light collection efficiency. . . .'" Pet. Reply 2–3 (quoting
Pet. 12–14; Ex. 1003 ¶¶ 82–87). Petitioner counters Patent Owner's
arguments by contending that Patent Owner has a "misinformed
understanding of Inokawa's lens" and "lenses in general." *Id.* at 3 (citing
PO Resp. 12). According to Petitioner, "a POSITA would understand that
Inokawa's lens generally improves 'light concentration at pretty much all of
the locations under the curvature of the lens,' as opposed to only at a single
point at the center as asserted by Masimo." *Id.* (citing Ex. 2006, 164:8–16).

According to Petitioner, part of Patent Owner's misunderstanding
may be due to Patent Owner ignoring the principle of reversibility. *Id.* at 4–
14. For example, Petitioner contends that Patent Owner and Dr. Madisetti
"ignore[] the well-known principle of reversibility," by which "a ray going
from P to S will trace the same route as one from S to P." *Id.* at 4 (emphasis
omitted) (citing, e.g., Ex. 1052,[7,8] 84, 87–92; Ex. 1049, 101, 106–111;
Ex. 1047 ¶¶ 10–18). Petitioner contends that Dr. Madisetti was evasive
when he was asked to apply the reversibility principle to the combination of
Aizawa and Inokawa in this case. Pet. Reply 6 (citing Ex. 1034, 89:12–19).
Petitioner further contends that, "based at least on the principle of
reversibility," one of ordinary skill in the art "would have understood that
both configurations of LEDs and detectors—*i.e.*, with the LED at the center
as in Aizawa or with the detector at the center as in Inokawa—would

---

[7] Eugene Hecht, *Optics* (2nd ed. 1990).

[8] It is apparent that the page numbering identified by Petitioner for
Exhibit 1052 refers to the document's native page numbering and not the
page numbering of the exhibit appearing at the bottom, middle of each page.
For clarity and consistency, in this Decision, we also use the same page
numbering as Petitioner for Exhibit 1052.

similarly benefit from the enhanced light-gathering ability of an Inokawa-like lens." *Id.* at 9 (citing Ex. 1047 ¶ 22).

Petitioner also asserts that Patent Owner and Dr. Madisetti overlook the fact that light rays reflected by body tissue in the user's wrist, to be received by detectors in either Aizawa's or Inokawa's pulse sensor, will be "scattered" and "diffuse" and, therefore, will approach the detectors "from various random directions and angles." Pet. Reply 9–10, 13 (annotating Inokawa's Fig. 2 to illustrate the cause and nature of the back-scattering); Ex. 1047 ¶¶ 25–26, 31. This scattered and diffuse light, according to Petitioner, means that Inokawa's "lens cannot focus all incoming light toward the sensor's center," as Patent Owner would have it. Pet. Reply 9 (citing Ex. 1047 ¶ 23; Ex. 2006, 163:12–164:2). Petitioner asserts this is due to Snell's law, and provides several illustrations to illustrate why. *Id.* at 9–15 (citing, e.g., Ex. 1047 ¶¶ 23–34).

Due to the random nature of this scattered light, Petitioner explains that one of ordinary skill in the art would have understood that a convex cover "provides a slight refracting effect, such that light rays that may have missed the detection area are instead directed toward that area." Pet. Reply 10 (citing Ex. 1047 ¶¶ 25–26). Petitioner applies this understanding to Aizawa, and contends that using a lens with a convex protrusion in Aizawa would "enable backscattered light to be detected within a circular active detection area surrounding" a central light source. *Id.* (citing Ex. 1051, 86, 90).

Moreover, Petitioner dismisses the applicability of Figure 14B of the '708 patent as illustrating the operation of a *transmittance*-type of sensor that measures the attenuation of collimated light transmitted through the

IPR2021-00193
Patent 10,299,708 B1

user's body tissue, rather than the *reflectance*-type sensor of Aizawa. *Id.*
at 11–13 (citing, e.g., Ex. 1001, 35:65–67; Ex. 1047 ¶¶ 27–31).

Petitioner further maintains that contrary to Patent Owner's argument,
Petitioner's illustrations of the light-focusing properties of a convex lens
discussed in the Petition filed in IPR2020-01520 (Ex. 2019, 39) and relied
upon by Dr. Kenny (Ex. 2020, 119–120) do not demonstrate "that a convex
lens directs all light to the center." Pet. Reply 15 (citing PO Resp. 15–17).
Petitioner contends these illustrations, instead, "are merely simplified
diagrams included to illustrate . . . one example scenario (based on just one
ray and one corpuscle) where a light permeable cover can 'reduce a mean
path length of light traveling to the at least four detectors'" as recited in
claim 12 of the patent challenged in that proceeding. *Id.* (citing, e.g.,
Ex. 1047 ¶ 34).

### (4)     Patent Owner's Sur-reply

Patent Owner asserts that Petitioner's Reply improperly presents
several new arguments, relying on new evidence, as compared with the
Petition. *See, e.g.*, Sur-reply 1 ("new optics theories" and "new
arguments"), 2, 6, 7, 9, 10, 12, 13.

Patent Owner also contends that Petitioner mischaracterizes Patent
Owner's position, which is not that Inokawa's lens with a convex protrusion
"would direct '*all*' light 'only at a *single point* at the center'" of the sensor.
*Id.* at 2 & n.2 (quoting Pet. Reply 3; citing, e.g., Ex. 2027, 63:7–64:6, 94:20–
96:1, 96:18–97:7). Patent Owner's position, rather, is that Inokawa's lens
condenses more light (not necessarily all light) "*towards the center* of the
sensor" as compared to a flat surface. *Id.* at 2 (quoting PO Resp. 19; citing,
e.g., Ex. 2004 ¶¶ 34, 43, 51, 53–54, 57, 67).

IPR2021-00193
Patent 10,299,708 B1

Patent Owner moreover asserts "[t]here can be no legitimate dispute that a convex surface directs light centrally (and away from the periphery)." Sur-reply 3–6 (citing PO Resp. 15–18; Ex. 2006, 86:19–87:6, 164:8–16, 170:22–171:5, 202:11–204:20; Ex. 2020 ¶¶ 119, 200; Ex. 2027, 181:9–182:5). Patent Owner contends that Petitioner's argument "that Inokawa would improve light-gathering at all locations, *regardless* of the location of the LEDs and detectors" is belied by Dr. Kenny's testimony that "Inokawa's benefit would *not* be clear if Inokawa's LEDs and detectors were moved" and "confirmed that a convex surface would direct light toward the center of the underlying sensor." *Id.* at 6 (citing Pet. Reply 3–4; Ex. 2006, 86:19–87:6, 202:11–204:20).

Patent Owner argues that Petitioner's discussion of the principle of reversibility is "irrelevant" because it "assumes ideal conditions that are not present when tissue scatters and absorbs light." Sur-reply 6–8 (citing Ex. 2027, 17:12–19:2, 29:11–30:7, 31:8–32:3, 38:17–42:6, 207:9–209:21, 210:8–6). The random nature of backscattered light, in Patent Owner's view, "hardly supports Petitioner's argument that light will necessarily travel the same paths regardless of whether the LEDs and detectors are reversed," and is irrelevant to the central issue presented here of "whether a convex surface—*as compared with a flat surface*—would collect and focus additional light on Aizawa's peripherally located detectors." *Id.* at 8–9 (citing Ex. 2027, 212:3–14).

Patent Owner also argues that Petitioner's position that a convex cover will provide a "*slight* refracting effect," "directly undermines Petitioner's provided *motivation* to combine," i.e., to enhance light collection efficiency. *Id.* at 10–11.

IPR2021-00193
Patent 10,299,708 B1

*(5)    Analysis*

Upon review of the foregoing, we conclude that a preponderance of the evidence supports Petitioner's view that it would have been obvious to modify Aizawa's cover 6 to include a convex lens or protrusion like that taught in Inokawa, in order to increase the amount of backscattered light that will be received by Aizawa's four peripheral detectors 22, as compared with Aizawa's existing flat cover.

Aizawa's and Inokawa's pulse sensors both gather data by emitting light into the user's wrist tissue, and collecting light that reflects back to the sensor from the user's tissue. *See, e.g.*, Ex. 1006, Figs. 1(b), 2 (sensor 2 has emitter 21 and four detectors 22, all facing a user's wrist 10); Ex. 1008, Figs. 1, 2 (sensor 1 has two emitters 21, 23 and one detector (photodiode 25), all facing the user's wrist when held in place by wristband 5). Dr. Kenny testifies, and Patent Owner agrees, that the reflection of this light by the user's wrist tissue randomizes the propagation direction of the reflected light rays. *See* Ex. 1003 ¶¶ 82–87; Ex. 1047 ¶¶ 14–15; Ex. 2020 ¶ 128; Sur-reply 7 ("Even Petitioner admits that tissue randomly scatters and absorbs light rays."). This reflection principle is illustrated by Dr. Kenny's annotations to Inokawa's Figure 2 reproduced below:

IPR2021-00193
Patent 10,299,708 B1



Here, Dr. Kenny has modified Inokawa's Figure 2 (1) by removing two black arrows, (2) by coloring Inokawa's light detector in red and Inokawa's two light emitters in green, and (3) by adding several green arrows to illustrate the various directions that light rays may be directed after impinging on and reflecting off different tissues in the user's wrist. Ex. 1047 ¶ 32.

This randomized direction of reflected light rays results in backscattered light that is diffuse, rather than collimated, in nature. Figure 4.12 of Exhibit 1052 illustrates the difference between diffuse and collimated light, and is reproduced below:



IPR2021-00193
Patent 10,299,708 B1

This figure provides at left a photograph and an illustration showing incoming collimated light reflecting from a smooth surface, and at right a photograph and an illustration of incoming collimated light reflecting from a rough surface. *See* Ex. 1052, 87–88. The smooth surface provides specular reflection, in which the reflected light rays are collimated like the incoming light rays. *See id.* By contrast, the rough surface provides diffuse reflection, in which the reflected light rays travel in random directions. *See id.*

This diffuse nature of the light reflected from the user's wrist tissue, which both Aizawa and Inokawa aim to collect to generate pulse data, suggests that a lens might be useful to increase the amount of collected light and thereby increase the reliability of the pulse data generated using the collected light. Indeed, that is taught by Inokawa. Inokawa describes using its lens 27 to "increase the light-gathering ability" of Inokawa's light photodiode or detector 25.[9] Ex. 1008 ¶¶ 15, 58. Furthermore, there is also no dispute that Inokawa's lens 27 is understood to be shaped as a convex protrusion. *See, e.g.*, Ex. 1003 ¶¶ 84–85 (characterizing Inokawa as teaching a "convex protrusion that acts as a lens"); PO Resp. 1 (describing Inokawa as teaching a "convex lens"). Thus, Inokawa demonstrates that it was known in the art to use a lens comprising a protrusion to focus diffuse light reflected from body tissue on to the light detecting elements of a wrist-worn pulse sensor, and to increase the light gathered by the sensor thereby improving the device's calculation of the user's pulse.

---

[9] Although Inokawa refers to the "LED" such as emitters 21, 23 in that regard (*id.* ¶ 15), rather than photodiode 25, it is undisputed that photodiode 25 is the only component of Inokawa's sensor 1 that gathers light.

IPR2021-00193
Patent 10,299,708 B1

A preponderance of the evidence supports Petitioner's view that it would have been obvious for a person of ordinary skill in the art to apply Inokawa's lens technology to Aizawa's wrist-worn pulse sensor, to similarly improve its light collection as compared to Aizawa's existing flat cover. That is illustrated by the following annotated figures provided by Dr. Kenny:

 

The illustration at left modifies Aizawa's Figure 1(b) to color Aizawa's emitter in green, its detectors in red, and Aizawa's existing flat cover in blue; the illustration on the right includes Aizawa's Figure 1(b) with the same color coding, but wherein the flat cover is modified to incorporate a convex protrusion that covers Aizawa's peripheral light detectors and central light emitter. *See* Ex. 1003 ¶ 87. We are persuaded by Dr. Kenny's testimony that Snell's law indicates that "light rays that may have otherwise missed the detection area are instead directed toward that area as they pass through the interface provided by the cover," and is especially true "in configurations like Aizawa's in which light detectors are arranged symmetrically about a central light source, so as to enable backscattered light to be detected within a circular active detection area surrounding that source." Ex. 1047 ¶ 26; *see also id.* ¶¶ 23–26.

Patent Owner correctly notes that Inokawa's single detector 25 is located in the central portion of Inokawa's sensor 1, whereas Aizawa's four detectors 22 are located towards the periphery of Aizawa's sensor 2. *Compare* Ex. 1008, Fig. 2, *with* Ex. 1006, Figs. 1(a)–1(b). Nevertheless, Petitioner's proposed modification of Aizawa takes that arrangement into

IPR2021-00193
Patent 10,299,708 B1

account, as can be seen by the following comparison between Inokawa's sensor and Petitioner's proposed modification of Aizawa's sensor:



The illustration at left annotates Inokawa's Figure 2 to identify the central detector in red and the lens in blue (*see* Ex. 1003 ¶ 85), and the illustration at right annotates Petitioner's proposed modification of Aizawa to illustrate the peripheral detectors in red and the lens in blue (*see id.* ¶ 87). As can be seen, the lenses are not identical. In Inokawa, the lens's curvature is most pronounced at the center of the lens near the central detector, and in the proposed modification to Aizawa, the lens's curvature is most pronounced at the edges of the lens near the peripheral detectors. Thus, Dr. Kenny's proposed modification of Aizawa takes Inokawa's general teaching of using a convex protrusion lens to increase the amount of incoming light directed to a light detector, and applies it to the four light detectors of Aizawa. *See, e.g.*, Ex. 1003 ¶ 87 ("[A] POSITA would have found it obvious to combine the teachings of Aizawa and Inokawa such that the flat cover (left) of Aizawa is modified to include a lens/protrusion (right) as per Inokawa in order to 'increase the light-gathering ability,'" and "allow more light to be gathered and refracted toward the light receiving cavities of Aizawa, thereby further increasing the light-gathering ability of Aizawa beyond what is achieved through the tapered cavities."); *id.* ¶¶ 82–89; Ex. 1047 ¶¶ 7–34.

IPR2021-00193
Patent 10,299,708 B1

We are cognizant of Patent Owner's contention that Petitioner's
ground "improperly" relies upon a reference, Nishikawa, that was not
identified as a part of the ground of unpatentability. PO Resp. 32–33. As
Patent Owner observes, Dr. Kenny characterizes his testimony as being
"*inspired* by" or "motivated" in part based on Nishikawa's disclosure when
it comes to the shape of a convex lens. *See, e.g.*, PO Resp. 32–33 (citing,
e.g., Ex. 2007, 364:2–13; Ex. 2008, 73:8–12) (emphasis omitted). We,
however, disagree with Patent Owner that any impropriety arises from
Dr. Kenny's contemplation of the teachings of Nishikawa in connection with
the shape of a lens for a physiological sensor. The nature of Petitioner's and
Dr. Kenny's consideration of Nishikawa is explained in cited portions of
Dr. Kenny's declaration, even if Nishikawa is not listed as a third reference
in the identification of the ground. *See* Ex. 1003 ¶ 89 ("[M]any prior art
references of this period, such as Nishikawa (shown below) demonstrate
exactly how such a lens [as taught by Inokawa] may be incorporated into a
molded cover."); Pet. 15–16. Indeed, it follows readily from the Petition
that a skilled artisan would have appreciated that Nishikawa's teachings
provide insight as to how "the transparent acrylic material used to make
Aizawa's plate can be readily formed into a lens [structure] as in Inokawa."
Pet. 15. Nishikawa describes how its "lens unit 50" can be a transparent
resin formed in the shape illustrated in Figure 6 by injection molding.
Ex. 1023 ¶¶ 22, 32, 35. Dr. Kenny also explains that Nishikawa's lens shape
design "is intended to provide curvature in the lens where it can do the most
good and otherwise try to avoid excess use of material in order to create
curvature in locations where it wouldn't do any good." Ex. 2006,
179:21–180:13.

IPR2021-00193
Patent 10,299,708 B1

Moreover, we observe that a rejection based on obviousness "require[s] an analysis that reads the prior art in context, taking account of 'demands known to the design community,' 'the background knowledge possessed by a person having ordinary skill in the art,' and 'the inferences and creative steps that a person of ordinary skill in the art would employ.'" *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013) (quoting *KSR*, 550 U.S. at 418). Furthermore, record evidence can be useful to "demonstrate the knowledge and perspective of one of ordinary skill in the art." *Id.*; *see also Ariosa Diagnostics v. Verinata Health Inc.*, 805 F.3d 1359, 1365 (Fed. Cir. 2015) ("Art can legitimately serve to document the knowledge that skilled artisans would bring to bear in reading the prior art identified as producing obviousness.").

As noted above, Dr. Kenny makes clear that his view as to obviousness of the claims of the '708 patent was "inspired by" or "motivated" in part by Nishikawa's teachings as to shapes generally known to those in the art of manufacturing a lens. *See, e.g.*, Ex. 2007, 364:2–13; Ex. 2008, 73:12–21. We conclude that the record establishes that Nishikawa's teachings are representative of background knowledge of one of ordinary skill in the art and provide context and perspective of a skilled artisan as to the type of shapes available for a convex protruding surface, such as that disclosed in Inokawa. That Dr. Kenny considered record evidence cited in the Petition as informing his view of what a skilled artisan would understand as to known types of lens shapes does not establish, in our view, any impropriety as part of that ground.

Patent Owner additionally asserts, and Dr. Madisetti testifies, that Petitioner's combination of Aizawa and Inokawa is "problematic" because it overlooks the "small" size of Aizawa's detectors 22 and the openings or

42

IPR2021-00193
Patent 10,299,708 B1

cavities 23c in which they are housed. *See* PO Resp. 21–22 (citing
Ex. 1006, Fig. 1(a); Ex. 2004 ¶ 65). Patent Owner, however, does not
articulate what significance the size of Aizawa's detector components have
in the obviousness evaluation based on the teachings of the prior art.

We additionally do not agree with Patent Owner's argument that
Petitioner's Reply presents new arguments and evidence that should have
been first presented in the Petition. The Petition proposed a specific
modification of Aizawa to include a convex protrusion in the cover, for the
purpose of increasing the light gathering ability of Aizawa's device. *See,
e.g.*, Pet. 12–16. Patent Owner, in its Response, then challenged that
contention with several arguments that Petitioner's proposed convex
protrusion would not operate in the way the Petition alleged. *See, e.g.*, PO
Resp. 15–35. In its Reply, Petitioner provided arguments and evidence
attempting to rebut the contentions in the Patent Owner Response. *See*
PTAB Consolidated Trial Practice Guide (Nov. 2019),[10] 73 ("A party also
may submit rebuttal evidence in support of its reply."). The Reply does not
change Petitioner's theory for obviousness; rather, the Reply presents more
argument and evidence in support of the same theory for obviousness
presented in the Petition. *Compare* Pet. 12–16, *with* Pet. Reply 2–13.

Patent Owner finally argues that a conclusion of obviousness "strains
credibility" because the level of ordinary skill in the art (*see supra*
Section II.B) does not require specific education or experience with optics or
optical physiological monitors. *See, e.g.*, PO Resp. 30. We disagree.
Concerning motivation, an ordinarily skilled artisan would have readily
appreciated from the record at hand that: (1) Aizawa's detector 1 operates

---

[10] Available at https://www.uspto.gov/TrialPracticeGuideConsolidated.

by gathering light data with its photodetectors 22; (2) a lens was known to focus the light on photodetectors; and (3) optical lenses may be formed by providing a convex protrusion in the lens to focus light.  Indeed, Inokawa discloses such utility, function, and structure as a part of its convex lens. *See, e.g.*, Ex. 1008 ¶¶ 15, 58, Fig. 2.  We are persuaded that a person of ordinary skill in the art would have understood these general concepts of optics.

Concerning reasonable expectation of success, we rely on Dr. Kenny's testimony that a person of ordinary skill in the art would have understood that "by positioning a lens above the optical components of Aizawa . . . the modified cover will allow more light to be gathered and refracted toward the light receiving cavities of Aizawa, thereby further increasing the light-gathering ability of Aizawa beyond what is achieved through the tapered cavities," and "would have found it obvious to combine the teachings of Aizawa and Inokawa such that the flat cover (left) of Aizawa is modified to include a lens/protrusion (right) as per Inokawa in order to 'increase the light-gathering ability.'" *See, e.g.*, Ex. 1003 ¶ 87; Ex. 2006, 179:21–180:13, 202:11–20.

Thus, we conclude that one of ordinary skill in the art would have had adequate reason to replace Aizawa's flat cover 6 with a cover comprising a convex protrusion, to improve light detection efficiency, and would have had a reasonable expectation of success in doing so.

### vi.    Summary

For the foregoing reasons, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claim 1 would have been obvious over the cited combination of references.

### 4.    *Independent Claim 19*

Independent claim 19 consists of limitations that are substantially similar to elements [a]–[d] of claim 1.  *Compare* Ex. 1001, 44:36–50, *with id.* at 45:53–46:11 (reciting a "housing including a raised wall protruding"). In asserting that claim 19 also would have been obvious over the combined teachings of Aizawa and Inokawa, Petitioner refers to substantially the same contentions presented as to claim 1.  *See* Pet. 35–38; Ex. 1003 ¶¶ 110–115.

Patent Owner does not present any argument for this claim other than those we have already considered with respect to independent claim 1.  PO Resp. 11–35.

For the same reasons discussed above, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claim 19 would have been obvious over the cited combination of references. *See supra* II.D.3.i–v; Ex. 1003 ¶¶ 110–115.

### 5.    *Dependent Claims 2–9, 11, 13–15, 20–22, and 24–27*

Petitioner presents undisputed contentions that claims 2–9, 11, 13–15, 20–22, and 24–27, which depend directly or indirectly from independent claim 1 or 19, are unpatentable over the combined teachings of Aizawa and Inokawa, and provides arguments explaining how the references teach the limitations of these claims.  Pet. 24–35, 38–40; Ex. 1003 ¶¶ 90–109, 116–122.

Patent Owner does not present any arguments for these claims other than those we have already considered with respect to independent claim 1. PO Resp. 35 ("The Petition fails to establish that independent claims 1 and 19 would have been obvious in view of [the first ground]'s cited references

and thus fails to establish obviousness as to any of the challenged dependent claims.") (citing Ex. 2004 ¶ 79).

We have considered the evidence and arguments of record and determine that Petitioner has demonstrated by a preponderance of the evidence that claims 2–9, 11, 13–15, 20–22, and 24–27 would have been obvious over the combined teachings of the cited references and as supported by the testimony of Dr. Kenny.

### E. *Obviousness over Aizawa, Inokawa, and Ohsaki*

Petitioner argues claims 1–9, 11, 13–15, 19–22, and 24–27 of the '708 patent would have been obvious over Aizawa, Inokawa, and Ohsaki. Pet. 2, 40–43. Patent Owner opposes. PO Resp. 35–39. We conclude a preponderance of the evidence supports Petitioner's assertions as to these challenged claims. We begin our analysis with a brief summary of Ohsaki, then we address the parties' contentions.

### 1. *Ohsaki Disclosure*

Ohsaki discloses a pulse wave sensor attached to the back side of the user's wrist. Ex. 1014, codes (54), (57). Figures 1 and 2 are reproduced below:



IPR2021-00193
Patent 10,299,708 B1

Figure 1 is a cross-sectional view of pulse wave sensor 1 attached on a user's wrist 4. *Id.* ¶¶ 12, 16, 18. Figure 2 is a schematic diagram of detecting element 2 of sensor 1 on wrist 4, and associated electronics. *Id.* ¶¶ 13, 17.

Figure 1 illustrates how detecting element 2 is attached to the back side of the wrist. In this context, the wrist's "back" side is the side opposite to the user's palm, and the wrist's "front" side is the palm side of the hand. *See, e.g.*, *id.* ¶¶ 5–6, 16.

Detecting element 2 comprises a light emitter (LED 6) and a light detector (photodetector 7) for optically interrogating the user's wrist 4 tissue to detect a pulse wave of the user. *See id.* ¶¶ 3, 7–8, 16, 20, 22. Translucent board 8 of element 2 has "a convex surface . . . in intimate contact with the surface of the user's skin," and "[t]hereby it is prevented that the detecting element 2 slips off the detecting position of the user's wrist 4." *Id.* ¶¶ 9, 17–18, 25.

Figures 3A–3B provide test data comparing the performance of a pulse wave sensor depending on whether it is mounted to the back side or the front side of the user's wrist. *See id.* at Figs. 3A–3B, ¶¶ 14, 23–24. Figures 4A–4B provide test data comparing the performance of a pulse wave sensor depending on whether translucent board 8 is convex (as shown in Figures 1 and 2) or flat. *See id.* at Figs. 4A–4B, ¶¶ 15, 25.

### 2.    *Claim 1*

Petitioner provides arguments and evidence, including testimony from Dr. Kenny, in support of Petitioner's contention that claim 1 is unpatentable as having been obvious over Aizawa, Inokawa, and Ohsaki. Pet. 40–43; Ex. 1003 ¶¶ 64–65, 123–127. Patent Owner provides arguments and

evidence in opposition, including testimony from Dr. Madisetti. PO Resp. 35–39; Ex. 2004 ¶¶ 80–86.

This ground relies on the same prior art as in the prior ground, then adds Ohsaki as providing a further motivation for modifying Aizawa's flat plate 6 to have a convex protrusion. *See* Pet. 40–43; Ex. 1003 ¶¶ 123–127. Petitioner asserts "Ohsaki teaches that adding a convex surface to the light permeable cover (*i.e.*, [Ohsaki's] translucent board 8) can help prevent the device from slipping on the tissue when compared to a flat cover" such as Aizawa's plate 6. Pet. 42–43 (citing Ex. 1014 ¶ 25); Ex. 1003 ¶ 125. Petitioner asserts that Aizawa, similarly to Ohsaki, "seeks to prevent slippage between the device and the user's wrist—and pursues this objective by pressing its . . . [plate 6] and trying to improve 'adhesion between the wrist 10 and the pulse rate detector 11.'" Pet. 43 (citing Ex. 1006 ¶¶ 26, 30); Ex. 1003 ¶ 125. Dr. Kenny testifies a POSITA "would have recognized that Ohsaki's addition of a convex protrusion to its light permeable cover could be similarly implemented in Aizawa's device to help achieve the two references' shared goal of minimizing slippage," which "would have allowed Aizawa's sensor device to remain better adhered to the skin and thereby increase its light-collecting efficiency." Ex. 1003 ¶¶ 126, 142 (citing Ex. 1006 ¶¶ 26, 30; Ex. 1014 ¶ 25); Pet. 42–43.

Patent Owner argues in opposition that the Petition is fatally deficient because it is "unclear as to whether a POSITA would have incorporated Inokawa's lens or Ohsaki's translucent board" in Aizawa. PO Resp. 36; Ex. 2004 ¶ 80. We disagree. The first ground relies on Inokawa as providing a first motivation for adding a protrusion to Aizawa's flat cover: to direct more light to Aizawa's detectors 22. *See supra* Section II.D.3.v. This ground relies additionally on Ohsaki as providing a second, and

IPR2021-00193
Patent 10,299,708 B1

independent, motivation for adding a protrusion to Aizawa's flat cover: to reduce slippage between Aizawa's device and the user's wrist. *See* Pet. 42–43. Neither ground seeks to bodily incorporate Inokawa's lens or Ohsaki's translucent board into Aizawa's device, and this is not required for obviousness. *See In re Keller*, 642 F.2d 413, 425 (CCPA 1981).

Patent Owner next contends that Patent Owner's various arguments opposing first ground also apply to this ground. *See* PO Resp. 35–36; Ex. 2004 ¶ 82. For the reasons provided in Section II.D.3 above, Patent Owner's arguments opposing the first ground based on Aizawa and Inokawa are unavailing.

Patent Owner further asserts "a POSITA would have understood that Ohsaki's board would not prevent slippage with Aizawa's sensor." PO Resp. 37 (section heading modified). According to Patent Owner, Ohsaki indicates "its protruding surface must have *longitudinal directionality*" such that "one must orient its longitudinal convex surface with the longitudinal direction of the user's arm." PO Resp. 37 (citing Ex. 1014 ¶ 19); Ex. 2004 ¶ 83. Patent Owner argues Aizawa's detector 1, by contrast, uses a circular arrangement of four detectors 22 around one emitter 21, and "Aizawa specifically *distinguishes* its sensor from linear sensors such as Ohsaki's." PO Resp. 37 (citing Ex. 1006, code (57), ¶¶ 9, 27, 36; Ex. 1014 ¶ 19; Ex. 2008, 165:20–166:5); Ex. 2004 ¶ 84. Patent Owner concludes a "POSITA would not have believed Ohsaki's longitudinal protruding surface would benefit Aizawa's sensor" due to this difference. PO Resp. 38; Ex. 2004 ¶ 85.

Patent Owner moreover argues Ohsaki's "protruding surface only prevents slipping on the backhand side (i.e., watch-side) of the user's wrist," and "Ohsaki's sensor has 'a tendency to slip off' if it is on the palm side of

49

IPR2021-00193
Patent 10,299,708 B1

the user's wrist." PO Resp. 37 (citing Ex. 1014 ¶¶ 23–24, Figs. 3A–3B); Ex. 2004 ¶ 83. Patent Owner asserts Aizawa's detector 1, by contrast, is held against the front side of the user's wrist to be close to the artery there, and "Aizawa reports that on the *palm side* of the wrist, a *flat surface* improves adhesion." PO Resp. 37–38 (citing Ex. 1006, Figs. 2, 3, code (57), ¶¶ 2, 9, 13, 26–28, 30, 34, 36); Sur-reply 14–15 (similarly citing Ex. 1006); Ex. 2004 ¶¶ 84–85. Patent Owner cites evidence demonstrating that these arteries are on the front side of the wrist. PO Resp. 38 (citing Ex. 2010, 44, 71 (Plates 429 and 456)); Ex. 2004 ¶ 85. Patent Owner concludes a POSITA would not have believed Ohsaki's convex surface would benefit Aizawa's device based on this difference in device location on the user's wrist. PO Resp. 38; Ex. 2004 ¶ 85.

Petitioner replies that, despite the differences between Aizawa and Ohsaki identified by Patent Owner, a POSITA would nonetheless have understood from Ohsaki that "a convex surface . . . can help prevent the device from slipping on the tissue of the wearer compared to using a flat cover without such protrusion." Pet. Reply 15–16 (quoting Ex. 1003 ¶¶ 125–126); Ex. 1047 ¶ 35. According to Petitioner, Ohsaki contrasts between "flat" and "convex" detecting surfaces, and explains the "detected pulse wave is adversely affected by the movement of the user's wrist" with a flat surface but not a convex surface. Pet. Reply 16 (citing Ex. 1014, Figs. 1, 2, 4A–4B, ¶¶ 15, 17, 25); Ex. 1047 ¶ 37. Petitioner asserts "Ohsaki was relied upon not for its exact cover configuration" as Patent Owner suggests, but instead "for the rather obvious concept that a convex surface protruding into a user's skin will prevent slippage." Pet. Reply 18; Ex. 1047 ¶ 37 ("[A]dding a convex surface to Aizawa's flat plate will serve to *improve* its tendency to not slip off, not take away from it, since it is well understood

IPR2021-00193
Patent 10,299,708 B1

that physically extending into the tissue and displacing the tissue with a protrusion provides an additional adhesive effect.").

Patent Owner replies "Ohsaki demonstrates that a convex surface alone does ***not*** prevent slipping because Ohsaki's shape is designed to fit within the underlying bone structure of the wrist and forearm on the backhand side." Sur-reply 16 (citing Ex. 1014, Figs. 3A–3B, ¶¶ 6, 19, 23–24). Patent Owner asserts "Ohsaki explains that a convex surface on the palm side has a tendency to slip, notwithstanding any alleged 'physical[] digging.'" *Id.* at 17 (alteration in original). Ohsaki also teaches, according to Patent Owner, "that one should avoid too much pressure because otherwise the user 'feels uncomfortable,' which results in movement and a tendency to slip." *Id.* (citing Ex. 1014 ¶¶ 6, 18, 24).

Upon review of the foregoing arguments and evidence, we conclude a preponderance of the evidence supports Petitioner's contention that a person of ordinary skill in the art would have been motivated to modify Aizawa's plate 6 to include a convex protrusion, in order to help prevent slippage of Aizawa's detector 1 on the user's wrist, based on Ohsaki.

A person of ordinary skill in the art would have understood from Ohsaki that forming a convex protrusion on the face of an optically-based pulse sensor where it is pressed against the user's wrist to gather optical data will beneficially prevent slippage of the sensor during operation. Ohsaki states: "The detecting element 2 is arranged on the user's wrist 4 so that *the convex surface* of the translucent board 8 *is in intimate contact with the surface of the user's skin. Thereby it is prevented that the detecting element 2 slips* off the detecting position of the user's wrist 4." Ex. 1014 ¶ 25 (emphases added). A POSITA would understand from this disclosure that forming a convex protrusion on the tissue-contacting face of a

IPR2021-00193
Patent 10,299,708 B1

wrist-worn, optically-based pulse sensor will resist movement of the sensor on the user's wrist during use. *See* Ex. 1003 ¶¶ 141–142; Ex. 1047 ¶ 52. A POSITA would also understand this resistance to be a beneficial result, because it will improve the pulse sensor's ability to emit light into and detect light reflected from the user's wrist, to generate a pulse signal. *See* Ex. 1006 ¶¶ 26, 30, 34; Ex. 1014 ¶¶ 23, 25, 27; Ex. 1003 ¶¶ 125–126; Ex. 1047 ¶ 37.

Indeed, Ohsaki expressly compares the performance of a wrist-worn pulse wave sensor depending on whether translucent board 8 is convex or flat, and concludes the former results in improved performance over the latter, especially when the user is moving. *See* Ex. 1014, Figs. 4A–4B, ¶¶ 15, 25 (stating that with "a flat surface, the detected pulse wave is adversely affected by the movement of the user's wrist 4," and with "a convex surface like the present embodiment, the variation of the amount of the reflected light" collected by the sensor "is suppressed"). Ohsaki also states that, with a convex protrusion, it is "prevented that noise such as disturbance light from the outside penetrates the translucent board 8." *Id.* ¶ 25.

Patent Owner and Dr. Madisetti attempt to limit the foregoing disclosures of Ohsaki to its particular context—a sensor having one emitter 6 disposed next to one detector 7 to define a "longitudinal" sensing direction between them, and being attached to the back side rather than the front side of the user's wrist. *See* Ex. 2004 ¶¶ 83–85. We are not persuaded. For example, Ohsaki's disclosure does not support Dr. Madisetti's conclusion that it is *only* in this particular context that a convex protrusion will help prevent slippage. *See* Ex. 1014 ¶ 19 (discussing the longitudinal direction orientation of Ohsaki's sensor); *id.* at Figs. 3A–3B, ¶¶ 16, 23–24 (discussing attaching Ohsaki's sensor to the back side of the wrist). Figures 3A–3B

52

IPR2021-00193
Patent 10,299,708 B1

compare the performance of detecting element 2, including its translucent board 8 having a convex protrusion, and show better performance when it is attached to the back side of the wrist versus the front side of the wrist, when the user is in motion. *See* Ex. 1014 ¶¶ 17 (Fig. 2), 23–24 (Figs. 3A–3B). Because the tested device incorporates a convex protrusion in both instances, Figures 3A–3B do not support Dr. Madisetti's conclusion that "Ohsaki teaches that a protruding surface on the palm side of the wrist would not prevent slipping" — particularly in comparison to a flat surface such as Aizawa's. Ex. 2004 ¶ 85.

We credit, instead, Dr. Kenny's testimony that a person of ordinary skill in the art would have understood from Ohsaki that a convex protrusion will help prevent slippage, even in the context of Aizawa's arrangement of four detectors surrounding a central emitter (or emitters, when modified per Inokawa) attached on the front side of the user's wrist. *See* Ex. 1047 ¶ 37. This is because, even in Aizawa's arrangement, the convex protrusion will "physically extend[] into the tissue and displac[e] the tissue," as is illustrated for example in Ohsaki's Figures 1 and 2, where translucent board 8 physically extends into and displaces the tissue of wrist 4. *Id.*

Dr. Madisetti also testifies that "Aizawa reports that on the palm side of the wrist, a flat surface improves adhesion," so "a POSITA would have believed that adding Ohsaki's protruding surface would have disrupted the improved adhesion properties reported for Aizawa's flat plate." Ex. 2004 ¶ 85 (citing Ex. 1006, Figs. 3A–3B, ¶¶ 13, 26, 28, 30, 34; Ex. 1014, Figs. 3A–3B, ¶¶ 23–24). We disagree with this reading of Aizawa. It is true that Aizawa's plate 6 is illustrated as having a flat surface (Ex. 1006, Fig. 1(b)), and that Aizawa states the plate "improve[s] adhesion" (*id.* ¶ 13). Aizawa also states: "the above belt 7 is fastened such that the acrylic

IPR2021-00193
Patent 10,299,708 B1

transparent plate 6 becomes close to the artery 11 of the wrist 10," and "[t]hereby, adhesion between the wrist 10 and the pulse rate detector 1 is improved." *Id.* ¶ 26. These disclosures, however, indicate the improved adhesion is provided by the acrylic material of plate 6, not the flat surface of plate 6 as Dr. Madisetti would have it. *See also id.* ¶¶ 30, 34 ("Since the acrylic transparent plate 6 is provided . . . adhesion between the pulse rate detector 1 and the wrist 10 can be improved . . . ."). Thus, there is no teaching away from using a convex surface to improve the adhesion of Aizawa's detector to the user's wrist. *See, e.g.*, Ex. 1003 ¶ 126; Ex. 1047 ¶ 37.

Finally, we acknowledge that both Aizawa and Ohsaki express a concern about exerting too much pressure against the front side of the user's wrist, because this would make the user uncomfortable. *See, e.g.*, Ex. 1006 ¶¶ 6, 26, 31; Ex. 1014 ¶¶ 6, 18, 24. Thus, a person of ordinary skill in the art would understand that there are operational limits on how large the protrusion can be made in Aizawa. Nonetheless, claim 1 does not place any limitations on the size of the protrusion, and as discussed above a protrusion would improve the ability to avoid slippage of Aizawa's detector 1 when worn on the front side of a user's wrist. Therefore, it would have been obvious to add a protrusion to Aizawa's detector 1 for that purpose, and optimize the size of the protrusion to avoid user discomfort.

Based on the foregoing arguments and evidence, we conclude Petitioner has demonstrated by a preponderance of the evidence that claim 1 is unpatentable as having been obvious over Aizawa, Inokawa, and Ohsaki.

3.    *Claims 2–9, 11, 13–15, 19–22, and 24–27*

Petitioner relies on its arguments from the first ground based on Aizawa and Inokawa in contending that claims 2–9, 11, 13–15, 19–22, and 24–27 are unpatentable under this ground, which adds Ohsaki.  *See* Pet. 42; Ex. 1003 ¶ 123–127.  In defense of these claims, Patent Owner relies solely on arguments relating to claim 1.  *See, e.g.*, PO Resp. 35–39; Ex. 2004 ¶ 86. Thus, for the reasons provided above in relation to the first ground based on Aizawa and Inokawa (all challenged claims) and this ground (claim 1), we conclude Petitioner has demonstrated by a preponderance of the evidence that claims 2–9, 11, 13–15, 19–22, and 24–27 are unpatentable as having been obvious over Aizawa, Inokawa, and Ohsaki.

F.    *Obviousness over the Combined Teachings of Aizawa, Inokawa, and Mendelson-2006*

Petitioner contends that claims 16, 27, and 28 are unpatentable based on Aizawa, Inokawa, and Mendelson-2006. Pet. 43–48. Claim 16 depends from claim 1 and recites, "[t]he noninvasive optical physiological sensing system of claim 1 further comprising a touch-screen display." Ex. 1001, 45:38–39. Claim 27 ultimately depends from claim 19 and further recites, "[t]he noninvasive optical physiological sensing system of claim 26, wherein the noninvasive optical physiological sensing system is comprised as part of a mobile monitoring device." *Id.* at 46:43–46. Claim 28 depends from claim 27 and further recites, "[t]he noninvasive optical physiological sensing system of claim 27, wherein the mobile monitoring device includes a touch-screen display." *Id.* at 46:47–49.

IPR2021-00193
Patent 10,299,708 B1

### 1. Mendelson-2006 (Ex. 1016)

Mendelson-2006 is a journal article titled "A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring," and discloses a wireless wearable pulse oximeter connected to a personal digital assistant ("PDA"). Ex. 1016, 912.[11]

Figure 1 of Mendelson-2006 is reproduced below.



---

[11] Petitioner cites to the native page numbers that accompany the article, rather than the page numbers added to Exhibit 1016. *See, e.g.*, Pet. 43–45. We follow Petitioner's numbering scheme.

IPR2021-00193
Patent 10,299,708 B1

Figure 1 illustrates a sensor module attached to the skin (top), and a
photograph of a disassembled sensor module and receiver module (bottom).
The sensor module includes an optical transducer, a stack of round printed
circuit boards, and a coin cell battery. *Id.* at 913.

Figure 2 of Mendelson-2006 is reproduced below.



Figure 2 depicts a system block diagram of the wearable, wireless, pulse
oximeter including the sensor module (top) and the receiver module
(bottom). *Id.* The sensor module includes at least one light-emitting diode
("LED"), a photodetector, signal processing circuitry, an embedded
microcontroller, and an RF transceiver. *Id.* at 912, 913. Mendelson-2006
discloses that a concentric array of discrete photodetectors could be used to
increase the amount of backscattered light detected by a reflectance type
pulse oximeter sensor. *Id.* at 915. The receiver module includes an
embedded microcontroller, an RF transceiver for communicating with the

IPR2021-00193
Patent 10,299,708 B1

sensor module, and a wireless module for communicating with the PDA. *Id.*
at 913.

As a PDA for use with the system, Mendelson-2006 discloses "the HP
iPAQ h4150 PDA because it can support both 802.11b and Bluetooth™
wireless communication" and "has sufficient computational resources." *Id.*
at 914. Mendelson-2006 further discloses that

> [t]he use of a PDA as a local terminal also provides a low-cost
> touch screen interface. The user-friendly touch screen of the
> PDA offers additional flexibility. It enables multiple controls to
> occupy the same physical space and the controls appear only
> when needed. Additionally, a touch screen reduces development
> cost and time, because no external hardware is required. . . . The
> PDA can also serve to temporarily store vital medical
> information received from the wearable unit.

*Id.*

The PDA is shown in Figure 3 of Mendelson-2006, reproduced below.



Figure 3 illustrates a sample PDA and its graphical user interface ("GUI").
*Id.* Mendelson-2006 explains that the GUI allows the user to interact with
the wearable system. *Id.* "The GUI was configured to present the input and
output information to the user and allows easy activation of various

functions." *Id.* "The GUI also displays the subject's vital signs, activity level, body orientation, and a scrollable PPG waveform that is transmitted by the wearable device." *Id.* For example, the GUI displays numerical oxygen saturation ("$SpO_2$") and heart rate ("HR") values. *Id.*

### 2. Analysis

With support from the testimony of Dr. Kenny, Petitioner contends that claims 16, 27, and 28 are unpatentable based on Aizawa, Inokawa, and Mendelson-2006. Pet. 43–48 (citing Ex. 1003 ¶¶ 69–71, 128–136; Ex. 1006 ¶¶ 2, 15, 23, 35; Ex. 1008 ¶ 56; Ex. 1016, 912–914, Figs. 1, 3; Ex. 1022). For instance, Petitioner applies the teachings of Mendelson-2006 to account for the mobile monitoring device features required by claim 27 and the touch-screen display recited in claims 16 and 28. *Id.*

Patent Owner does not separately address this ground urging only that the ground "do[es] not fix the deficiencies" that were alleged in connection with the ground based on Aizawa and Inokawa. PO Resp. 39. As discussed above, we do not agree with Patent Owner as to any such deficiencies. *See supra* § II.D.

We have reviewed the parties' papers and supporting evidence and conclude that Petitioner has shown by a preponderance of the evidence that claims 16, 27, and 28 are unpatentable based on Aizawa, Inokawa, and Mendelson-2006.

### G. *Obviousness over the Combined Teachings of Aizawa, Inokawa, Mendelson-2006, and Beyer*

Petitioner contends that claims 17, 18, and 29 are unpatentable based on Aizawa, Inokawa, Mendelson-2006, and Beyer. Pet. 48–53. Claim 17 depends from claim 1 and recites, "a processor configured to: receive one or

IPR2021-00193
Patent 10,299,708 B1

more signals from the at least four detectors, the one or more signals
indicative of a physiological parameter of a wearer of the noninvasive
optical physiological sensing system; and output information indicative of
measurements of the physiological parameter to a mobile phone." Ex. 1001,
45:42–48. Claim 18 depends from claim 17 and further recites, "wherein at
least the processor is housed in a mobile monitoring device comprising a
touch-screen display." *Id.* at 45:50–51. Claim 29 depends from claim 19
and recites, "[a] physiological monitoring system comprising: the
noninvasive optical physiological sensing system of claim 19; and a
processor configured to receive the one or more signals and communicate
physiological measurement information to a mobile phone." *Id.* at 46:50–
55.

### 1.  *Overview of Beyer (Ex. 1019)*

Beyer is a U.S. patent titled "Cellular Phone/PDA Communication
System," and discloses a "cellular PDA communication system for allowing
a plurality of cellular phone users to monitor each others' location and status
[and] to initiate cellular phone calls." Ex. 1019, code (57). Beyer's Figure 1
is reproduced below.

IPR2021-00193
Patent 10,299,708 B1



*FIG. 1*

Figure 1 depicts a "cellular phone/PDA and display." *Id.* at 7:8–9.

## 2. *Analysis*

With support from the testimony of Dr. Kenny, Petitioner contends that claims 17, 18, and 29 are unpatentable based on Aizawa, Inokawa, Mendelson-2006, and Beyer. Pet. 48–53 (citing, e.g., Ex. 1003 ¶¶ 138–146; Ex. 1016, 913–914; Ex. 1019, 1:6–15, 7:17–31, Fig. 1). For instance, Petitioner applies the teachings of Beyer to account for showing that "using a PDA that is also a mobile phone . . . was common practice," and that such devices can include a touch-screen display, as required by claim 18. *Id.*

Patent Owner does not separately address this ground urging only that the ground "do[es] not fix the deficiencies" that were alleged in connection with the ground based on Aizawa and Inokawa. PO Resp. 39. As discussed above, we do not agree with Patent Owner as to any such deficiencies. *See supra* § II.D.

We have reviewed the parties' papers and supporting evidence and conclude that Petitioner has shown by a preponderance of the evidence that

IPR2021-00193
Patent 10,299,708 B1

claims 17, 18, and 29 are unpatentable based on Aizawa, Inokawa, Mendelson-2006, and Beyer.

### H. *Obviousness over the Combined Teachings of Aizawa, Inokawa, and Al-Ali*

Petitioner contends that claim 10 is unpatentable over Aizawa, Inokawa, and Al-Ali. Pet. 60–62. Dependent claim 10 ultimately depends from independent claim 1 and recites that "the protruding light permeable cover comprises a conductive layer configured to shield the at least four detectors from noise." Ex. 1001, 45:18–20.

### 1. *Overview of Al-Ali (Ex. 1030)*

Al-Ali is a U.S. patent application publication titled "Multiple Wavelength Optical Sensor." Ex. 1030, code (54). Al-Ali discloses an optical sensor with an emitter that radiates light into a tissue site to be received by a detector such that, e.g., oxygen saturation may be derived. *Id.* at code (57). Al-Ali describes detector 1900 having shield 1910 with conductive surface 1920 defining windows, shown below in Figure 19A. *Id.* ¶ 71.



## FIG. 19A

IPR2021-00193
Patent 10,299,708 B1

Figure 19A depicts a top view of a detector. Al-Ali explains that light is permitted to pass through the windows, while other electromagnetic noise is blocked. *Id.* Al-Ali explains that additional shielding material also can be applied to the ceramic substrate 1710. *Id.*

## 2. *Analysis*

Petitioner contends that "Al-Ali teaches shielding the detectors of a pulse oximeter/optical sensor by placing a conductive shield 1920 above the housing, thereby providing a Faraday cage that can allow 'passage of light' to the detectors while 'blocking . . . electromagnetic noise.'" Pet. 60–61 (citing Ex. 1030 ¶ 71, Fig. 19A; Ex. 1003 ¶ 162-A). Petitioner asserts this "improve[s] the sensitivity of the detectors, thereby leading to more reliable pulse/signal detection." *Id.* at 61.

According to Petitioner, a person of ordinary skill in the art "would have found it obvious to add a similar conductive shield/layer between the detectors and the LPC [light permeable cover] to prevent electromagnetic noise from reaching the detectors while still allowing desired signals/wavelengths to pass through, thereby reducing the effects of noise and resulting in improved light collection efficiency." *Id.* (citing Ex. 1003 ¶ 162-B). Petitioner contends that this "entails the use of known solutions to improve similar systems and methods in the same way," and "would have led to [the] predictable result of reducing noise and improving signal collection without significantly altering or hindering the functions performed by Aizawa." *Id.* at 62 (citing Ex. 1003 ¶ 162-C).

Patent Owner does not separately address this ground urging only that the ground "do[es] not fix the deficiencies" that were alleged in connection with the ground based on Aizawa and Inokawa. PO Resp. 39. As discussed

IPR2021-00193
Patent 10,299,708 B1

above, we do not agree with Patent Owner as to any such deficiencies.  *See supra* § II.D.

We have reviewed the parties' papers and supporting evidence and conclude that Petitioner has shown by a preponderance of the evidence that claim 5 is unpatentable based on Aizawa, Inokawa, and Al-Ali.  Specifically, Al-Ali teaches the use of a conductive material to eliminate noise.  Ex. 1030 ¶ 71.  In light of this teaching, we credit Dr. Kenny's unrebutted testimony that a person of ordinary skill in the art would have found it obvious to implement such a conductive material in the sensor of Aizawa and Inokawa to also reduce noise, as was a well-known technique in the art.  Ex. 1003 ¶¶ 162-A, 162-B.

## I.   *Obviousness over the Combined Teachings of Aizawa, Inokawa, Goldsmith, and Lo*

Petitioner contends that claims 16–18 and 27–29 of the '708 patent are unpatentable over Aizawa, Inokawa, Goldsmith, and Lo.  Pet. 53–60.

Because we have already determined that these claims are unpatentable, we need not reach this additional ground applied to these claims.  *See Boston Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. 2020); *see supra* §§ II.F–G.

## J.   *Obviousness over the Combined Teachings of Mendelson-1988 and Inokawa*

Petitioner contends that claims 1–9, 11–15, and 19–26 of the '708 patent would have been obvious over the combined teachings of Mendelson-

IPR2021-00193
Patent 10,299,708 B1

1988 and Inokawa. Pet. 62–90.[12] We note that this is the only ground to challenge claims 12 and 23 of the '708 patent.

### 1. Overview of Mendelson-1988 (Ex. 1015)

Mendelson-1988 discloses a pulse oximeter, with an optical reflectance sensor suitable for noninvasive monitoring of a user's arterial hemoglobin oxygen saturation (SpO$_2$), via the user's forehead. *See* Ex. 1015, 167 (title & abstract). Figure 2 is reproduced below:



Figure 2 illustrates the sensor of Mendelson-1988, including: (A) a top view diagram; (B) a side view diagram; and (C) a photograph. *Id.* at 169.

---

[12] Petitioner never refers to the '708 patent in regards to this ground, instead referring to the '190 patent. We assume that this is an oversight and caused by forgetting to change the patent number in reproducing this Petition after drafting the highly similar petition in IPR2021-00195, which challenges the '190 patent. As such, we will assume that Petitioner means to refer to the '708 patent and not the '190 patent.

IPR2021-00193
Patent 10,299,708 B1

The sensor includes two red LEDs and two infrared LEDs for emitting light into the user's tissue, and six photodiodes "arranged symmetrically in a hexagonal configuration" surrounding the four emitters, to detect light reflected back to the sensor from the user's tissue. *Id.* at 168 ("SENSOR DESIGN"). The user's "SpO$_2$ can be calculated from the ratio of the reflected red and infrared photoplethysmograms." *Id.* at 167. "To minimize the amount of light transmission and reflection between the LEDs and the photodiodes within the sensor, a ring-shaped, optically opaque shield of black Delrin . . . was placed between the LEDs and the photodiode chips." *Id.* at 168 (col. 2). "The optical components were encapsulated inside the package using optically clear adhesive." *Id.* "The microelectronic package was mounted inside a black Delrin housing." *Id.*

### 2. *Independent Claim 1*

#### i. *"A noninvasive optical physiological sensing system comprising:"*

The cited evidence supports Petitioner's undisputed contention that Mendelson-1988 discloses a noninvasive optical physiological measurement system, i.e., an "optical reflectance sensor" that monitors "arterial hemoglobin oxygen saturation [SpO$_2$]," a physiological parameter of the wearer. Pet. 68; *see, e.g.*, Ex. 1015, 167, 172; Ex. 1003 ¶ 163. Petitioner specifically contends that a person of ordinary skill in the art "would have recognized that a personal computer, together with the pulse oximeter sensor attached to it, provides the claimed sensing system." Pet. 68 (citing Ex. 1003 ¶ 163).

66

IPR2021-00193
Patent 10,299,708 B1

> ii.    *"[a] a platform including a planar surface"*

The cited evidence supports Petitioner's undisputed contention that Mendelson-1988 discloses "LEDs and photodiode chips (i.e., emitters and detectors) [that] are mounted on a ceramic substrate (platform) that has a planar surface." Pet. 68 (citing Ex. 1015, Fig. 2(b), 168) (emphasis omitted); *see, e.g.*, Ex. 1003 ¶ 164.

> iii.    *"[b] a housing including a raised edge portion*
> *extending from and enclosing at least a portion of the*
> *planar surface"*

The cited evidence supports Petitioner's undisputed contention that Mendelson-1988 discloses an AIRPAX package, i.e., a housing with a ceramic substrate, i.e., a surface, and a circular raised edge extending from the surface. Pet. 69–70. Petitioner's annotated versions of Mendelson-1988's Figures 2A and 2B are reproduced below.

67

IPR2021-00193
Patent 10,299,708 B1





*Id.* The modified figures depict top and side views of Mendelson-1988's sensor with a housing (depicted in red) having a surface (depicted in purple) with a circular raised edge (depicted in green) extending from the surface. *Id.*; Ex. 1003 ¶¶ 165–166.

> iv.  "[c] *at least four detectors arranged on the planar surface of the platform and within the housing, wherein the at least four detectors are arranged in a grid pattern such that a first detector and a second detector are arranged across from each other on opposite sides of a central point along a first axis, and a third detector and a fourth detector are arranged across from each other on opposite sides of the*

> central point along a second axis which is
> perpendicular to the first axis"

The cited evidence supports Petitioner's undisputed contention that Mendelson-1998 discloses "six silicon photodiodes . . . arranged symmetrically in a hexagonal configuration" on the surface.  Pet. 70 (citing Ex. 1015, 169, Figs. 2(A)–(B); Ex. 1003 ¶ 167).  Petitioner recognizes that Mendelson-1988's "first and second axes as shown above are not perpendicular to each other," but points out that Mendleson-1988 "does not indicate that its system only works with six detectors."  Pet. 72 (citing Ex. 1003 ¶ 169; Ex. 1015, 168).  According to Petitioner, "a POSITA would have considered using different numbers of spaced-apart detectors, namely 4 or 8, to be obvious and a routine and conventional design choice."  *Id.* at 74 (citing Ex. 1006 ¶ 32; Ex. 1003 ¶ 171).

> *v.*    "[d] the housing including a protruding light
> permeable cover"

> *(1)    Petitioner's Contentions*

Petitioner contends that Mendelson-1988's sensor discloses all limitations of claim 1, except that its light permeable cover that is arranged above a portion of the housing and covers the detectors, i.e., the "OPTICALLY CLEAR EPOXY" in Figure 2B, lacks the claimed "protrusion."  *See* Pet. 64–67, 74–75; Ex. 1003 ¶¶ 172–181.  As discussed above in Section II.D.3, Petitioner contends that Inokawa's sensor includes lens 27, comprising a convex protrusion arranged to cover its light detector 25.  Pet. 65.  Petitioner reasons that an ordinarily skilled artisan would have been motivated, with a reasonable expectation of success, to modify Mendelson-1988's optical SpO$_2$ sensor, in light of Inokawa's optical

IPR2021-00193
Patent 10,299,708 B1

pulse sensor, by adding a lens with a protrusion to Mendelson-1988's cover to improve the sensor's light detection efficiency. *Id.*

Dr. Kenny provides the following illustrations to portray the proposed modification of Mendelson-1988's sensor (Ex. 1003 ¶ 176):



At the left, Dr. Kenny has excerpted and annotated Mendelson-1988's Figure 2B, to identify the pre-existing cover (colored blue) which covers the light emitters and detectors. *See id.* At the right, Dr. Kenny has illustrated the device resulting from the proposed modification of the cover to have a protrusion (also colored blue). *See id.*

Petitioner further asserts "there are two alternative ways of identifying the claimed 'light permeable cover,' or LPC,'" to the modified cover above. Pet. 74; Ex. 1003 ¶¶ 172–173. Dr. Kenny provides the following two annotations of Mendelson-1988's Figure 2B to identify these alternative mappings:

IPR2021-00193
Patent 10,299,708 B1



APPLE-1015, FIG. 2(B)



APPLE-1015, FIG. 2(B).

Dr. Kenny's first mapping (top figure) equates the cover to the entire depth of the epoxy contained within the AIRPAX package as shown in red outline. Ex. 1003 ¶ 180. Dr. Kenny's second mapping (bottom figure) equates the cover to a partial depth of the epoxy within the package as shown in red outline. *Id.* ¶ 181 ("[A person of ordinary skill in the art] would have been able to use the top portion of the housing . . ., as in Nishikawa, to help form the LPC portion on top of the sealing portion.").

Petitioner adds that a person of ordinary skill in the art "would have realized that the epoxy layer [of Mendelson-1998] could have been given a shape that would help further advance Mendelson-1988's objective of improving detection efficiency," "requir[ing] only routine knowledge of

IPR2021-00193
Patent 10,299,708 B1

sensor design and assembly." Pet. 64, 66 (citing Ex. 1015, 168, 173);
Ex. 1003 ¶¶ 173, 177.  For example, "as demonstrated by Nishikawa,
molding clear epoxy, as in Mendelson-1988, into a lens was well
understood." Pet. 66–67 (citing Ex. 1023, Fig. 6, ¶¶ 22, 32, 35; Ex. 1003
¶ 178).

### (2)    Patent Owner's Arguments

Patent Owner is of the view that Petitioner has not met its burden to
demonstrate the obviousness of modifying Mendelson-1988's sensor in light
of Inokawa to have a protrusion, based on substantially the same analysis
and testimony discussed above in the context of combining Aizawa and
Inokawa.  *See* PO Resp. 39–52; Ex. 2004 ¶¶ 91–115; *supra* Section II.D.3.
For example, Mendelson-1988, like Aizawa, provides a central emitter or
emitters surrounded by several detectors.  *Compare* Ex. 1015, 169 (Fig. 2)
(showing four central LEDs surrounded by six photodiodes), *with* Ex. 1006,
Figs. 1(a)–1(b) (showing one central LED 21 surrounded by four
photodetectors 22).

Patent Owner argues that Mendelson-1988 discloses only that it
encapsulates its electronic components with a flat optically clear
adhesive/epoxy, which is not a "cover." PO Resp. 45 (citing Ex. 1004
¶¶ 102–103).  Patent Owner contends that the '708 patent distinguishes
between resin and covers.  PO Resp. 45–46 (citing Ex. 1001, 36:37–46;
Ex. 2009, 395:22–396:17).  Patent Owner also argues that Nishikawa, on
which Petitioner relies, "never mentions a cover, and instead discusses
encapsulation of components using an integrally molded resin." *Id.* at 46
(citing Ex. 1023 ¶ 35; Ex. 2004 ¶ 104).  Likewise, Patent Owner
characterizes Inokawa's cover as a "***distinct structure***, not an

undifferentiated mass of resin on a surface." *Id.* (citing Ex. 1008 ¶ 103, Fig. 17).

Patent Owner also objects to Petitioner's alternative mapping, providing for a cover with a protrusion to be found in two different ways. *See* PO Resp. 46–48; Ex. 2004 ¶¶ 105–107. This alternative mapping, according to Patent Owner, is "ambiguous[]," and the second mapping incorporates an "arbitrary" drawn line defining the bottom of the cover in "an ***undifferentiated*** mass of material." PO Resp. 47. Patent Owner also argues that "Petitioner's inability to consistently identify a 'cover' reveals the hindsight-driven nature of its arguments." *Id.*

### (3)    *Petitioner's Reply*

Petitioner maintains that the Petition and supporting testimony adequately account for the "cover" required by the claims of the '708 patent, including the "alternative mapping" configuration. Pet. Reply 19–23.

### (4)    *Patent Owner's Sur-reply*

Patent Owner's Sur-reply generally reiterates its arguments challenging Petitioner's contentions. PO Sur-reply 18–23.

### (5)    *Analysis*

As an initial matter, we find that a preponderance of the evidence establishes that the Mendelson-1988 sensor's optically clear epoxy is a light permeable cover that is arranged above a portion of the housing and covers the sensor's detectors. In particular, it is clear from Figures 2A and 2B that the epoxy extends from the top of the sensor at the dotted line in the figure, down into the well of the AIRPAX package, to cover all four LEDs and all six photodiodes disposed at the bottom of the well. *See also* Ex. 1015, 168

("The optical components were encapsulated inside the package using optically clear adhesive").  Although Patent Owner disagrees, that disagreement is premised on its proposed claim construction of the term "cover" as excluding resins and epoxies.  *See* PO Resp. 45–48.  For reasons provided in Section II.C.1 above, we do not find that claim construction persuasive, and Patent Owner does not distinguish Mendelson-1988 from claim 1 on this basis.

Thus, we determine that Petitioner has established persuasively that Mendelson-1988's sensor teaches every limitation of claim 1, except that its light permeable cover has a flat surface and, thus, does not include a "protrusion."  We, however, conclude that a preponderance of the evidence supports Petitioner's contention that it would have been obvious to modify the top surface of Mendelson-1988's cover to include a protrusion, in order to increase the amount of backscattered light that will be received by Mendelson-1988's peripheral detectors.  Our reasoning is substantially identical to the analysis provided above in connection with the ground based on Aizawa and Inokawa, with Mendelson-1988 replacing Aizawa in the combination.  *See supra* Section II.D.3.  Patent Owner does not cite, and we do not discern, any material difference between Mendelson-1988 and Aizawa that might lead to a different result here, with one possible exception.

That difference is Petitioner's alternative mapping of the claimed "cover" to Petitioner's proposed modification of Mendelson-1988's sensor. We rely on the first mapping, but not Petitioner's second mapping, to decide in Petitioner's favor.  Petitioner's first mapping is again reproduced here (Ex. 1003 ¶ 180):

IPR2021-00193
Patent 10,299,708 B1



APPLE-1015, FIG. 2(B)

In this modified and annotated version of Figure 2B of Mendelson-1988, Dr. Kenny identifies how Mendelson-1988's light permeable cover may be modified to have a protrusion, wherein the cover (which Dr. Kenny has colored blue) includes the entire depth of the optically clear epoxy contained within the AIRPAX package (as Dr. Kenny has shown in red outline). *Id.*; Pet. 74–75. Patent Owner objects to this mapping as ambiguous, but we determine Dr. Kenny's annotations reproduced above are sufficiently clear to establish obviousness by a preponderance of the evidence.

### vi.    Summary

For the foregoing reasons, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claim 1 would have been obvious over the cited combination of references.

### 3.    Independent Claim 19

Independent claim 19 consists of limitations that are substantially similar to elements [a]–[d] of claim 1. *Compare* Ex. 1001, 44:36–50, *with id.* at 45:53–46:11 (reciting a "housing including a raised wall protruding"). In asserting that claim 19 also would have been obvious over the combined

IPR2021-00193
Patent 10,299,708 B1

teachings of Aizawa and Inokawa, Petitioner refers to substantially the same contentions presented as to claim 1. *See* Pet. 85–88; Ex. 1003 ¶¶ 199–202.

Patent Owner does not present any argument for this claim other than those we have already considered with respect to independent claim 1. PO Resp. 39–48; *see, e.g.*, *id.* at 45 ("Like the Aizawa grounds, Petitioner's Mendelson grounds do not satisfy all of the claim limitations. Claims 1 and 19 include a housing and a light permeable cover.") (citing Ex. 1001, 44:36–50, 45:53–46:11).

For the same reasons discussed above, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claim 19 would have been obvious over the cited combination of references. *See supra* §§ II.J.2.i–v; Ex. 1003 ¶¶ 172–181.

### 4.    *Dependent Claim 3*

Claim 3 ultimately depends from claim 1 and recites, "[t]he noninvasive optical physiological sensing system of claim 2, wherein the housing is a cylindrical housing protrusion." Ex. 1001, 44:57–59. Petitioner recognizes that Mendelson-1988's "particular housing shape . . . appears to have a generally rectangular shape, not a cylindrical one." Pet. 77–78 (citing Ex. 1015, Fig. 2(a)). However, Petitioner contends that a person of ordinary skill in the art "would have recognized that microelectronic packaging as used in Mendelson-1988 comes in various shapes and sizes." *Id.* at 78 (citing Ex. 1003 ¶ 185). Petitioner further contends that a person of ordinary skill in the art "would have considered using a differently shaped housing, namely a cylindrical one, to be obvious," and doing so "was common practice" prior to the '708 patent. *Id.* at 78–79 (citing Ex. 1003 ¶ 186).

IPR2021-00193
Patent 10,299,708 B1

Petitioner explains that its contentions are evidenced by another reference of record, Mendelson '799.[13] *Id.*

Patent Owner characterizes Petitioner's proposed ground for claim 3 as "facially deficient" for several reasons: (1) "Petition[er] never identifies a motivation to pick a cylindrical-shaped housing instead of the existing square shape"; (2) "[a person of ordinary skill in the art] would have no particular motivation to change the shape unless a [person of ordinary skill in the art] perceived some benefit in doing so"; (3) "Mendelson '799 does not disclose a cover (or even epoxy encapsulation) and thus cannot disclose a cylindrical housing and a cover of the cylindrical housing, as claim 3 requires"; and (4) "Petitioner did not include Mendelson '799 in any ground." PO Resp. 48–49 (citing Ex. 2004 ¶¶ 110–111).

In response to Patent Owner's arguments, Petitioner replies that "references like Mendelson [']799 have a circular housing and confirm the notion that a [person of ordinary skill in the art] would have found it to be simply a matter of design choice to use different shapes." Pet. Reply 23 (citing Ex. 1003 ¶ 186; Ex. 1025, Fig. 7, 9:34–36; Ex. 1047 ¶ 48). Petitioner also contends "neither the '708 patent nor [Patent Owner] provides any explanation of how the particular housing shape solves some problem or presents some unexpected result." *Id.* at 23–24 (citing *In re Kuhle*, 526 F.2d 553, 555 (CCPA 1975)).

Patent Owner responds that "Petitioner's reply reiterates its conclusory arguments that [the proposed] change would be routine, without

---

[13] U.S. Patent No. 6,801,799 B2, filed Feb. 6, 2003, issued Oct. 5, 2004 ("Mendelson 799," Ex. 1025).

IPR2021-00193
Patent 10,299,708 B1

identifying any reason to modify the shape from square to circular."
Sur-reply 21–22.

On the record before us, we conclude that a preponderance of the evidence supports Petitioner's contention that it would have been obvious to modify the shape of Mendelson-1988's AIRPAX package from square to circular.  Petitioner's and Dr. Kenny's general assessment that a person of ordinary skill in the art would have been aware that a circular housing shape was a known option for housing of components of a physiological sensor finds support in the record.  Pet. 77–78; Ex. 1003 ¶ 186.  In that respect, although Mendelson '799 was not listed in the styling of the proposed grounds of unpatentability based on Mendelson-1988 and Inokawa, its teachings plainly were offered in the Petition as evidence of the background knowledge that an ordinarily skilled artisan would have brought to bear in an evaluation of the teachings Mendelson-1988 and Inokawa.  Pet. 77–78.  Moreover, it is clear that Patent Owner understood that the proposed ground offered in the Petition took into account the disclosure of Mendelson '799, and Patent Owner had opportunity to address that disclosure.  Indeed, Patent Owner availed itself of that opportunity during trial (*see, e.g.*, PO Resp. 48–49; Sur-reply 21–22).

We further find unavailing Patent Owner's argument that "Mendelson '799 does not disclose a cover (or even epoxy encapsulation) and thus cannot disclose a cylindrical housing and a cover of the cylindrical housing, as claim 3 requires."  PO Resp. 49.  Figure 7 of Mendelson '799 is reproduced below:

IPR2021-00193
Patent 10,299,708 B1



*Figure 7*

Figure 7 is a top view of optical sensor 10 comprising light source 12
composed of three LEDs 12A, 12B, and 12C emitting light of three different
wavelengths, and an array of six near detectors 18 and six far detectors 16
"arranged in two concentric ring-like arrangements" surrounding light
source 12.  Ex. 1025, 9:23–34.  "All these elements are accommodated in a
sensor housing 17" which, as can be seen in Figure 7, is clearly circular.  *Id.*
at 9:34–35.  Patent Owner does not articulate why the presence or absence of
a cover in Mendelson '799 somehow serves to discount Mendelson '799's
unambiguous presentation of a sensor housing having a shape recognizable
as circular.

Furthermore, one of ordinary skill in the art would have understood
that the AIRPAX package of Mendelson-1988 and the housing 17 of
Mendelson '799 are performing the same function of enclosing a central
collection of light emitters which are surrounded by an array of light
detectors in an optical sensor attached to a user's body.  *See, e.g.*, Ex. 1015,
Figs. 2A–2B; Ex. 1025, Fig. 7.  The evidence of record also does not suggest

IPR2021-00193
Patent 10,299,708 B1

that the shape of such a housing has any functional significance in the operation of the optical sensor, or that any particular known shape was preferred or restricted.  Thus, the evidence suggests that a square shape and a circular shape of such a housing were known in the art to be predictable substitutes for one another, and therefore obvious variants.  *See, e.g.*, *KSR*, 550 U.S. at 416 ("[W]hen a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result."); *id.* at 417 ("[W]hen a patent 'simply arranges old elements with each performing the same function it had been known to perform' and yields no more than one would expect from such an arrangement, the combination is obvious." (citation omitted)).

We conclude Petitioner has demonstrated by a preponderance of the evidence that Petitioner's ground based on Mendelson-1988 and Inokawa conveys the unpatentability of claim 3.

### 5.  *Dependent Claims 2, 4–9, 11–15, and 20–26*

Petitioner provides argument and evidence, including testimony from Dr. Kenny, in support of its position that claims 2, 4–9, 11–15, and 20–26 are unpatentable over Mendelson-1988 and Inokawa.  Pet. 76–77, 79–85, 88–90 (citing, e.g., Ex. 1003 ¶¶ 163–209).  Patent Owner does not advance any arguments for claims 2, 4–9, 11–15, and 20–26, that are distinct from those provided for claims 1, 3, and 19.  *See* PO Resp. 52.  For the same reasons set forth in Sections II.J.2–4 above, we find Patent Owner's arguments unavailing as to claims 2, 4–9, 11–15, and 20–26.  Having evaluated the Petition and its underlying supporting evidence, we conclude that Petitioner has established by a preponderance of the evidence that

IPR2021-00193
Patent 10,299,708 B1

claims 2, 4–9, 11–15, and 20–26 are also unpatentable based on Mendelson-1988 and Inokawa.

### K.    Obviousness over the Combined Teachings of Mendelson-1988, Inokawa, and Mendelson-2006

Petitioner contends that claims 16, 27, and 28 of the '708 patent would have been obvious over the combined teachings of Mendelson-1988, Inokawa, and Mendelson-2006.  Pet. 90–93.

With support from the testimony of Dr. Kenny, Petitioner contends that claims 16, 27, and 28 are unpatentable based on Mendelson-1988, Inokawa, and Mendelson-2006.  Pet. 90–93 (citing Ex. 1003 ¶¶ 129, 210–216; Ex. 1015, 167, 169, Fig. 2; Ex. 1016, 912–915, Figs. 1–3).  For instance, Petitioner applies the teachings of Mendelson-2006 to account for the mobile monitoring device features required by claim 27 and the touch-screen display recited in claims 16 and 28.  *Id.*

Patent Owner does not separately address this ground urging only that the ground "do[es] not fix the Petition's deficiencies" that were alleged in connection with the ground based on Mendelson-1988 and Inokawa.  PO Resp. 52.  As discussed above, we do not agree with Patent Owner as to any such deficiencies.  *See supra* § II.J.

We have reviewed the Petition and its supporting evidence and conclude that Petitioner has shown by a preponderance of the evidence that claims 16, 27, and 28 are unpatentable based on Mendelson-1988, Inokawa, and Mendelson-2006.

IPR2021-00193
Patent 10,299,708 B1

### L. Obviousness over the Combined Teachings of Mendelson-1988, Inokawa, Mendelson-2006, and Beyer

Petitioner contends that claims 17, 18, and 29 of the '708 patent would have been obvious over the combined teachings of Mendelson-1988, Inokawa, Mendelson-2006, and Beyer. Pet. 93–96.

With support from the testimony of Dr. Kenny, Petitioner contends that claims 17, 18, and 29 are unpatentable based on Mendelson-1988, Inokawa, Mendelson-2006, and Beyer. Pet. 93–96 (citing, e.g., Ex. 1003 ¶¶ 72, 217–226; Ex. 1016, 912–915; Ex. 1019, 7:17–31, Fig. 1). The Petition frequently cites back to analysis for previously addressed grounds in explaining the arguments for this ground, as this ground contains many of prior art references and claims that were previously addressed in various capacities within the proposed grounds. *See*, *e.g.*, *id.* at 94 (analyzing claim 17 and writing "as discussed in Section III.H.1, the combined system of Mendelson-1988-Inokawa-Mendelson-2006 can rely on the receiver module of Mendelson-2006 to receive signals from Mendelson-1988's sensor and communicate with a PDA"). Petitioner further applies the teachings of Beyer to, for example, show that a person of ordinary skill in the art "would have considered using a different PDA than the one mentioned in Mendelson-2006, namely the cellular PDA of Beyer, to be obvious and a routine/conventional design choice," as required by claim 17. *Id.* at 94–95 (citing Ex. 1003 ¶¶ 72, 221–222; Pet. 48–53).

Patent Owner does not separately address this ground urging only that the ground "do[es] not fix the Petition's deficiencies" that were alleged in connection with the ground based on Mendelson-1988 and Inokawa. PO Resp. 52. As discussed above, we do not agree with Patent Owner as to any such deficiencies. *See supra* § II.J.

IPR2021-00193
Patent 10,299,708 B1

We have reviewed the Petition and its supporting evidence and conclude that Petitioner has shown by a preponderance of the evidence that claims 17, 18, and 29 are unpatentable based on Mendelson-1988, Inokawa, Mendelson-2006, and Beyer.

## III. CONCLUSION

In summary, we determine that a preponderance of the evidence establishes claims 1–29 of the '708 patent are unpatentable, as shown in the following table:[14]

| Claim(s) | 35 U.S.C. § | References | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–9, 11, 13–15, 19–22, 24–27 | 103 | Aizawa, Inokawa | 1–9, 11, 13–15, 19–22, 24–27 | |
| 1–9, 11, 13–15, 19–22, 24–27 | 103 | Aizawa, Inokawa, Ohsaki | 1–9, 11, 13–15, 19–22, 24–27 | |
| 16, 27, 28 | 103 | Aizawa, Inokawa, Mendelson-2006 | 16, 27, 28 | |
| 17, 18, 29 | 103 | Aizawa, Inokawa, Mendelson-2006, Beyer | 17, 18, 29 | |

---

[14] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. §§ 42.8(a)(3), (b)(2).

IPR2021-00193
Patent 10,299,708 B1

| 16–18, 27–29 | 103[15] | Aizawa, Inokawa, Goldsmith, Lo | | |
|---|---|---|---|---|
| 10 | 103 | Aizawa, Inokawa, Al-Ali | 10 | |
| 1–9, 11–15, 19–26 | 103 | Mendelson-1988, Inokawa | 1–9, 11–15, 19–26 | |
| 16, 27, 28 | 103 | Mendelson-1988, Inokawa, Mendelson-2006 | 16, 27, 28 | |
| 17, 18, 29 | 103 | Mendelson-1988, Inokawa, Mendelson-2006, Beyer | 17, 18, 29 | |
| **Overall Outcome** | | | 1–29 | |

## IV. ORDER

Upon consideration of the record before us, it is:

ORDERED that claims 1–29 of the '708 patent have been shown to be unpatentable; and

FURTHER ORDERED that, because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

---

[15] As explained above, because we conclude that the challenged claims are unpatentable on other grounds, we do not reach the merits of this ground.

IPR2021-00193
Patent 10,299,708 B1

FOR PETITIONER:

W. Karl Renner
Andrew Patrick
Hyun Jin In
Dan Smith
FISH & RICHARDSON P.C.
IPR50095-000913IP12@fr.com
PTABInbound@fr.com
axf-ptab@fr.com
patrick@fr.com
in@fr.com


FOR PATENT OWNER:

Joseph R. Re
Stephen W. Larson
Jarom D. Kesler
Jacob L. Peterson
KNOBBE, MARTENS, OLSON, & BEAR, LLP
AppleIPR2021-0193-708@knobbe.com
2jrr@knobbe.com
2swl@knobbe.com
2jzk@knobbe.com
2jup@knobbe.com

IPR2021-00193 – Patent 10,299,708
Apple v. Masimo

# CERTIFICATE OF SERVICE

I hereby certify that the original of this Notice of Appeal was filed via

U.S.P.S. Priority Mail Express on July 27, 2022 with the Director of the United

States Patent and Trademark Office at the address below:

Office of the Solicitor
United States Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313-1450

A copy of this Notice of Appeal is being filed and served on July 27, 2022 as

follows:

**To the USPTO Patent Trial and Appeal Board:**
Patent Trial and Appeal Board
Madison Building East
600 Dulany Street
Alexandria, VA 22313

(*via PTABe2e – as authorized by the Board*)

**To the U.S. Court of Appeals for the Federal Circuit:**
Clerk of Court
U.S. Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Washington, DC 20439

(*via CM/ECF – with filing fee*)

**Counsel for Petitioner Apple, Inc.**

W. Karl Renner
Hyun Jin In
Dan Smith
Andrew B. Patrick
Fish & Richardson P.C.

IPR2021-00193 – Patent 10,299,708
Apple v. Masimo

3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402
IPR50095-0009IP1@fr.com
PTABInbound@fr.com
in@fr.com

Dated:  July 27, 2022          By:  /Jarom Kesler/ _____
                                    Jarom D. Kesler (Reg. No. 57,046)
                                    Joseph R. Re (Reg. No. 31,291)
                                    Stephen W. Larson (Reg. No. 69,133)
                                    Jacob L. Peterson (Reg. No. 65,096)
                                    Attorneys for Patent Owner
                                    Masimo Corporation

55957357